ISRAEL T. DEYO et al., Respondents, *v.* CHARLES I. HUDSON et al., as Copartners under the Firm Name of C. I. HUDSON & Co., Appellants.

Unanimous decision of Appellate Division after special verdict — remedial liability — principal and agent — fraud and deceit — false promise made with intent to break same — action by members of law firm to recover money embezzled by their junior partner and lost in stock speculations, on margins, in a branch office of defendants conducted and managed by their agent — when defendants not bound by false statements and by acts of their agent in concealing speculations of the junior partner — when evidence insufficient to show authority of defendants' agent in acts complained of or that acts were ratified by defendants — proximate cause — deceit followed by negligence not the immediate cause of loss.

1. When a defendant's motion for a nonsuit is granted after a special verdict in favor of plaintiff and the Appellate Division unanimously reverses the judgment entered thereon and grants judgment on the special findings of the jury, the reversal of the judgment is reviewed in this court on the evidence and not on the special findings. The power of the Court of Appeals to review on the evidence is not defeated even by the unanimous decision where the exceptions to rulings on evidence and to the charge of the court sufficiently present the question whether the special verdict rests on a foundation of legal error.

2. A promise made for the pecuniary advantage of the promisor, with the present intention to break it, may be deemed to be the false statement of a material existing fact because it falsely represents the state of promisor's mind and the state of his mind is a fact. Remedial liability may arise from such an unqualified falsehood when loss results therefrom.

3. Where a principal, in ignorance of his agent's wholly collateral fraud, retains what appears to be the legitimate proceeds of a transaction, that is not enough to bind him as by a ratification. If a principal authorizes his agent to make a sale and the agent, on his own responsibility, aids a buyer in embezzling the purchase money or in swindling some one out of it, the mere receipt and retention of the money by the principal in ignorance of such wrongful acts may not bind him to repay the proceeds of the theft.

4. The plaintiffs are a law firm practicing in a city in which the defendants, stockbrokers, have a branch office in charge of an agent as manager. A junior member of this law firm opened an account in defendants' branch office and speculated on margins, losing money belonging to the plaintiffs and their clients. He confessed to the senior member of his firm and his peculations were made good. After that the senior member of plaintiffs' firm interviewed the manager of the defendants' branch office and told him that they were considering retaining the junior partner in their firm but would not if he continued to speculate in defendants' office, and asked defendants' agent to let them know if the junior partner came back to do any more trading, which defendants' manager promised to do. Thereafter the manager not only failed to inform the plaintiffs that the junior partner was trading in defendants' office but effectively aided him in concealing the fact, and on one occasion positively assured the senior partner of plaintiffs that the junior partner had not resumed trading. Plaintiffs sue to recover from defendants the loss that they have sustained by the junior partner's defalcations. Upon examination of the record it appears that there is no evidence that defendants authorized their agent to make false representations to plaintiffs or that he was held out as having such authority, or that it was within the scope of his employment, and there is no evidence that, by subsequent words or conduct, the defendants ratified his acts.

5. The bounds of legal liability are the reasonable and probable consequences of a breach of duty. If the broken false promise of a stockbroker's agent to give a law firm notice if a member of such firm, previously dishonest through stock speculation, resumes trading with the branch office where he lost the money he embezzled may be regarded as the act of the principals, the principals are not liable when the proximate cause of future stealings by such partner from the firm clients is the subsequent negligence of the law firm in failing to exercise reasonable care to prevent further defalcations.

*Deyo* v. *Hudson*, 174 App. Div. 746, reversed.

(Argued February 3, 1919; decided February 25, 1919.)

APPEAL from a judgment, entered December 6, 1916, upon an order of the Appellate Division of the Supreme Court in the third judicial department, reversing a judgment in favor of defendants entered upon a dismissal of the complaint by the court at a Trial Term after certain questions had been specially submitted to the jury and directing judgment in favor of plaintiffs on the answers thereto.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Nathan L. Miller* and *John Godfrey Saxe* for appellants. Carver's thefts were the proximate cause of plaintiffs' liability to its clients. (*Lowery* v. *Western Union Tel. Co.*, 60 N. Y. 198; *Laidlaw* v. *Sage*, 158 N. Y. 73; *Hall* v. *N. Y. Telephone Co.*, 214 N. Y. 49; *Jex* v. *Straus*, 122 N. Y. 293; *Hoffman* v. *King*, 160 N. Y. 618; *Ryan* v. *N. Y. C. R. R. Co.*, 35 N. Y. 209.) The plaintiffs were a contributing cause of their own losses in their deliberate action in failing to disclose Carver's embezzlements to Mitchell or the defendants. (*Dezell* v. *Odell*, 3 Hill, 215; *Armour* v. *Michigan Central R. R. Co.*, 65 N. Y. 111; *Royce* v. *Watrous*, 73 N. Y. 597; *Trustees* v. *Smith*, 118 N. Y. 634; *Mattes* v. *Frankel*, 157 N. Y. 603; *Howe Machine Co.* v. *Farrington*, 82 N. Y. 121; *U. S. Life Insurance Co.* v. *Salmon*, 157 N. Y. 682; 91 Hun, 535; *Damon* v. *Surety Co.*, 161 App. Div. 875; *Bank of Monongahela Valley* v. *Weston*, 159 N. Y. 201; *Albany City Savings Inst.* v. *Burdick,* 87 N. Y. 40; *Wilcox* v. *Am. Tel. Co.*, 176 N. Y. 115.) The plaintiffs, as a matter of law, had no right to rely on anything Mitchell said; and there is no legal evidence that they did so rely. (Kinkead's Law of Torts, § 725; *Cowen* v. *Simpson,* 1 Espinasse, 290; *Starr* v. *Bennett*, 5 Hill, 303; *Dambmann* v. *Schulting*, 75 N. Y. 55; *Zagarino* v. *Kurzrok*, 135 App. Div. 763; *Creamer* v. *Peshkin*, 81 Misc. Rep. 167; *Sanborn* v. *Lefferts*, 58 N. Y. 179; *Auspacher* v. *Pfeiffer*, 13

N. Y. Supp. 418; *Martin v. Clark,* 19 App. Div. 496.)
Mitchell was not guilty of actionable deceit; nor are
defendants responsible for his actions in dealing with a
stranger. (*Reed v. Clark C. G. Co.,* 47 Hun, 410; *Gallager
v. Brunel,* 6 Cow. 346; *Gray v. Palmer,* 2 Robt. 500;
41 N. Y. 620; *Lexow v. Julian,* 21 Hun, 577; 86 N. Y.
638; *Taylor v. Commercial Bank,* 174 N. Y. 181; 175
N. Y. 464; 68 App. Div. 458; *Wilson v. Meyer,* 154
App. Div. 300, 302; *Field v. Seibert Bearing Co.,* 179
App. Div. 780; *Dambmann v. Shulting,* 75 N. Y. 55;
*American Credit Co. v. Wimphfeimer,* 14 App. Div. 498;
*Zagarino v. Kurzrok,* 135 App. Div. 763.)

*Harvey D. Hinman* for respondents. The unanimous
decision of the Appellate Division precludes the defend-
ants from raising in this court any question based upon
the sufficiency of the evidence to sustain the verdict.
(Code Civ. Pro. § 191, subd. 3; *Szuchy v. Hillside
C. & I. Co.,* 150 N. Y. 219; *People ex rel. Manhattan
R. Co. v. Barker,* 152 N. Y. 417; *Meserole v. Hoyt,* 161
N. Y. 59; *City of Niagara Falls v. N. Y. C. & H. R. R.
R. Co.,* 168 N. Y. 610; *Marden v. Dorthy,* 160 N. Y. 39;
*Reed v. McCord,* 160 N. Y. 330; *Cronin v. Lord,* 161
N. Y. 90; *Kennedy v. Mineola H. & F. Traction Co.,*
178 N. Y. 508; *Le Gendre v. Scottish U. & N. Ins. Co.,*
183 N. Y. 392; *Tyndall v. N. Y. C. & H. R. R. R. Co.,*
213 N. Y. 691.) The retention of Carver by plaintiffs
in their firm was the proximate cause of the loss and
damage which the plaintiffs sustained and the defendants
are liable for such damage because it was through their
misrepresentations that Carver was retained in the firm.
(*Ehrgott v. Mayor,* 96 N. Y. 264; *M. & S. P. Co. v.
Kellogg,* 94 U. S. 469; *Bird v. St. Paul F. & M. Ins. Co.,*
224 N. Y. 47; *Ehrgott v. Mayor, etc.,* 96 N. Y. 264, 282;
*Guille v. Swan,* 19 Johns. 381; *Gibney v. State,* 137
N. Y. 1; *Sharon v. Mosher,* 17 Barb. 518; *Vandenburgh v.*

*Truax*, 4 Denio, 464.) Mitchell's declaration to Deyo that he would inform Deyo in case Carver came back to trade in defendants' office, was not only a promise, it was a misrepresentation as well. (*Ottinger* v. *Bennett*, 144 App. Div. 525.) The plaintiffs had the right to rely on what Mitchell said, and the defendants are responsible for Mitchell's misrepresentations, because Mitchell in making such misrepresentations was acting within the scope of his authority. (*Green* v. *Des Garets*, 210 N. Y. 79; *Krumm* v. *Beach*, 96 N. Y. 398; *Fishkill Savings Inst.* v. *National Bank*, 80 N. Y. 162; *N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 N. Y. 30.)

POUND, J. This is an action to recover damages for deceit. Many of the material facts are in dispute and plaintiffs' version alone is stated. The plaintiffs, with William B. Carver, were law partners in Binghamton. Defendants are stockbrokers. Their principal office is at No. 36 Wall st., New York, but they have branch offices in Binghamton and other cities. Their business is extensive. They have memberships in the New York Stock Exchange and other desirable connections. The law firm looked after estate matters and trust funds and attended to investments for clients. Many securities were intrusted to them on which they collected the interest, received payments of principal and made reinvestments. In August, 1910, Carver confessed to Deyo that he had, since the preceding March, been speculating on margins in the stock market through defendants' Binghamton office and had stolen and lost more than $20,000 of their clients' money. Carver had a high standing in the community and passed as eminently respectable. He then closed his account with defendants and his peculations were made good. Plaintiffs had to decide what to do with him. To drop him from the firm might cause a scandal and their feeling toward him seems to have been sorrow

rather than indignation. Deyo in this connection, about November 1, 1910, interviewed Mitchell, the manager of defendants' Binghamton office. Mitchell regarded Carver as a good customer, one of a chosen dozen about there, and had in March written to his firm that: "Our new customer, W. B. Carver, will make a good trader and pay big commissions if he gets away right; he expressed great faith in Mr. Hudson's opinion; have looked him up and find that his father left him a lot of money, and that he has a large law practice."

Deyo testified that "I said to Mr. Mitchell that 'my junior partner has been speculating here in your office; he has lost every dollar he had; he has stripped himself completely; he has lost what he had over here. As a member of our firm he has to do with a great many trust funds; we are handling a great deal of money and securities for clients, *and our clients would not trust us, and very properly, if they understood that any member of our firm, or any man connected with the office was engaged in that line of business;* and that Col. Hitchcock and myself are considering the matter of retaining him in the firm; we will not retain him in the firm or permit him to be connected with the office if he engages in that sort of business.' I said to him that *Carver had promised that he would not, which was true.* I told him that Carver was a valuable man in some ways in the office; that he was a very accurate man and very painstaking man and that he could earn a living there, but I didn't know where he could earn a living elsewhere. And that question was up, that Col. Hitchcock and I were discussing as to whether we should retain him in the firm or not, and said, 'What I want you to do, I want you to let me know if he comes back here to do any more trading on your board.' In speaking about handling trust funds or funds belonging to estates, Mitchell replied, 'Oh, that is all right,' He said 'We never take on a customer on a

marginal account who occupies a trust position like, he said, ' a bank clerk,' and he used the expression, ' insurance clerk,' and I said, ' Yes, that is the case exactly; we are handling a large amount of trust funds and moneys belonging to other people,' and my recollection is, although I would not testify to it positively, that I also told him in that connection that he had not only stripped himself of everything he had, but that he had also lost everything that his wife had, what little she had. When I said to him that he has lost everything he has got, he said, ' I am surprised; I supposed he was a very wealthy man, and his father was a rich man and he was very wealthy.' I said, ' No, Mr. D. H. Carver was not a wealthy man and he left practically little to Will, but whatever he had is gone; he has lost it over here, and *I want you to let me know if he comes back here to do any more trading in your office,'* and he replied that he would do so. And that was the substance of our conversation.    *    *    * I told him that when we discovered it that we had concluded to notify Carver that he could not remain in the firm or connected with the firm in any capacity whatever; but that *he had promised that he was through with that, and we were reconsidering the matter of retaining him in the firm.*"

At that time Mitchell knew that Carver had reopened his account with the defendants in a small way. When he gave Deyo assurances that he would report any further trading by Carver he misstated his existing intention. He did not intend to tell Deyo anything on the subject. Deyo listened with credulity and the plaintiffs decided to keep Carver in the firm. On November 26, 1912, Carver disappeared. Then it was found that he had resumed both his peculations and his speculations and had appropriated securities belonging to clients of his firm and cash received by the firm for clients, amounting to more than $50,000. He had with money thus obtained purchased and sold through the defendants on margins,

stocks of the aggregate value of nearly $10,000,000, cotton in the aggregate value of more than $1,000,000 and grain of the aggregate value of about $800,000. Defendants' commissions on these transactions were about $11,000. Mitchell had not only failed to inform Deyo that Carver had resumed trading in defendants' office but had effectively aided Carver in concealing the fact, explaining in a letter to his principals that " his [Carver's] law partner is a strict church man and *does not believe in gambling.* This is a small town and accounts must be kept very quiet." He also took payments from Carver in currency instead of checks and on one occasion positively assured Deyo that Carver had *not* resumed trading.

Plaintiffs sue to recover from defendants the loss that thay have sustained by Carver's defalcations. Upon the trial the court reserved its ruling upon the defendants' motion for a nonsuit, and submitted special questions to the jury. The first question was as follows: " Did the defendants or defendants' employees, while acting within the scope of their employment, knowingly make to the plaintiffs false statements or misrepresentations as to existing facts, or knowingly conceal existing facts which the defendants or such employees ought, under the circumstances, to have disclosed to the plaintiffs; and if so, were the same made and done with the intention that the plaintiffs should rely thereon; and did the plaintiffs rely on such false statements, misrepresentations or concealments in continuing the law partnership of Deyo, Hitchcock & Carver with William B. Carver as a member; and were injury and damage to the plaintiffs the natural and probable results of such false statements, misrepresentations or concealments; and were such injury and damages received by the plaintiffs? " The jury answered this question in the affirmative. Other questions, seven in number, related to the amount of

damages growing out of the misappropriation of the funds of each client whose money had been taken and were also answered by the jury in plaintiffs' favor. The court thereafter granted the defendants' motion for a nonsuit and directed the entry of judgment against the plaintiffs for the dismissal of the complaint and the costs of the action. An appeal was taken to the Appellate Division, where an order was unanimously made, *first,* reversing the judgment appealed from and *secondly,* directing judgment on the special verdict in favor of plaintiffs. On such order judgment was entered in the sum of $67,462.45, from which defendants appeal.

In reviewing the order of the Appellate Division reversing the judgment of the trial court, although we have a unanimous decision that there is evidence supporting the special verdict, this court will consider the evidence and will not confine itself to the findings of the jury. The Constitution (Art. 6, sec. 9) in effect January 1, 1895, provides that, " No unanimous decision of the Appellate Division of the Supreme Court that there is evidence supporting or tending to sustain a finding of fact or a verdict not directed by the court, shall be reviewed by the Court of Appeals." The provisions of the Code (§ 1187) for nonsuit after special verdict were added by chapter 946, Laws of 1895, in effect January 1, 1896, and were not in the minds of the members of the Constitutional Convention when the unanimous decision rule was formulated. They now read as follows: " When a motion is made to nonsuit the plaintiffs or for the direction of a verdict, the court may, pending the decision of such motion, submit any question of fact raised by the pleadings to the jury or require the jury to assess the damage. After the jury shall have rendered a special verdict upon such submission or shall have assessed the damage, the court may then pass upon the motion to nonsuit or direct such general verdict as either party may be entitled to. On

an appeal from the judgment entered upon such nonsuit or general verdict, such special verdict, or general verdict, shall form a part of the record, and the appellate division or the court of appeals may direct such judgment thereon as either party may be entitled to."

When defendants' motion for a nonsuit is granted after verdict, and the Appellate Division unanimously reverses the judgment entered thereon and grants judgment on the special findings of the jury, the reversal of the judgment is reviewed in this court on the evidence and not on the special findings. The special verdict is in suspense until it is instated by the Appellate Division. The unanimous decision that there is evidence to support the verdict is not reviewed until the order of reversal has been first considered. Then the findings of fact may, if the reversal is upheld, be reviewed for the purpose of determining whether the judgment directed thereon is proper. The practice is different where a general verdict is rendered, set aside by the trial court and reinstated by the Appellate Division. Furthermore, this court's power of review would not be defeated in this appeal if we were to apply the unanimous decision rule to the judgment of reversal. Exceptions to rulings on evidence and to the charge of the court sufficiently present the question whether the special verdict rests on a foundation of legal error. (Cardozo on The Jurisdiction of the Court of Appeals, § 68.)

We turn, therefore, to a consideration of the case on the merits. Remedial liability depends upon the existence of a legal duty, binding upon the defendant and unfulfilled by him. Judged by their obliquity, the things men do may be regarded by their fellow men as sins or vices, but the civil law considers only whether they are actionable. The bounds even of legal liability are the reasonable and probable consequences of a breach of duty. (*Bird* v. *St. Paul F. & M. Ins. Co.*, 224 N. Y. 47.)

Plaintiffs contend that their loss was due to Mitchell's

fraudulent misrepresentation to them of his existing intent to conceal the fact if Carver again became a customer of the Binghamton house, when he knew that his intent was the contrary and that plaintiffs were relying and acting upon his promises.  Such false statement may be deemed the statement of a material existing fact, because it falsely represents the state of Mitchell's mind and the state of his mind is a fact.  (*Adams* v. *Gillig,* 199 N. Y. 314; *Ritzwoller* v. *Lurie,* 225 N. Y. 464.) They further contend that such misrepresentations and the accompanying and subsequent concealment by Mitchell of Carver's relation with defendants proximately led to Carver's retention in plaintiffs' firm, his opportunities to steal and his stealing; that prudent foresight would have revealed to Mitchell, when he made his false promises, that if Carver came back to him it would be with other people's money; that this deceit was the efficient cause which set all other causes in motion to plaintiffs' undoing; that it accomplished what Mitchell intended to accomplish; that he thus kept in his toils for a period of two years the good customer who would pay big commissions who would otherwise be driven away; that the business was thus retained and profits made therefrom; that defendants may not now disclaim responsibility for Mitchell's fraud.   (*Green* v. *des Garets,* 210 N. Y. 79.)

The first question to determine is whether Mitchell and Deyo entered into legal relations.  The inference is permissible that Mitchell uttered an unqualified falsehood when he said that he would notify Deyo if Carver resumed trading with the defendants; he uttered it with a fraudulent intent and plaintiffs acted thereon.  If injury resulted, with which defendants may be charged, the action can be maintained.  (*Rice* v. *Manley,* 66 N. Y. 82; *Adams* v. *Gillig, supra; Ritzwoller* v. *Lurie, supra.*)

The next question to determine is whether defendants are legally responsible as principals for the instrumentality

employed by their agent Mitchell to retain Carver as
a customer. *First*, did they authorize his misrepre-
sentations by antecedent words or conduct? Were such
misrepresentations within the scope of his employment?
Mitchell's general instructions were " just to get the
money " without any instructions to ascertain where it
came from. His duty was to conceal rather than disclose
the names of customers. He had no authority from
his firm to reveal them to the inquisitive. Doubtless
he would have subjected himself to censure had he done
so. His legal duty did not require him to warn those
who might be benefited by the knowledge that a partner,
clerk or relative was losing heavily. Whatever moral
obligation might exist, mere silence was not actionable.
He was authorized to go to extremes and did — apart
from the promise to Deyo — go to extremes in keeping
from the knowledge of plaintiffs the facts that might lead
to the closing of a profitable account. He was aided by
his principals in keeping promises of secrecy made by
him to Carver. That he was authorized in this con-
nection to lie to the business and family connections of
the patrons of his branch office is an inference without
support in the evidence. The evidence reveals no such
custom. The law implies none. His general authority
to retain customers and conceal customers; his duty to
retain them and keep confidential their dealings, did not
imply authority to make false representations to Deyo
that he would disclose to him any future operations on
the part of Carver. He was not held out as having such
authority. Such representations were not reasonably or
necessarily incidental to what he was authorized to do.

Deyo was chargeable with notice of the nature and
extent of Mitchell's powers. He knew that Mitchell had
no interest in the reputation of the law firm. He was
bound to know the rule that requires one in dealing with
an agent to ascertain the limits of his authority. Defend-

ants had no knowledge that such representations had been made. They were not made in defendants' name. Plaintiffs, having relied upon them without inquiry, may not transfer their loss to defendants without showing that defendants have assumed responsibility therefor.

*Secondly,* did defendants, by their subsequent words and conduct, ratify the acts of their agent? It is urged that they have retained their commissions and have thereby taken advantage of a collateral fraud perpetrated without their authority and never knowingly assented to by them; perpetrated not for the purpose of making a sale but merely for the purpose of preventing outside interference with a customer and that they are thus made answerable for the remotest consequences of the fraud. The rule which makes the receipt and retention of the fruits of an agent's fraud involve an innocent principal in liability on account of it (*Krumm* v. *Beach,* 96 N. Y. 398) is not unqualified. It has been said that such a ruling applied to collateral *contracts* would be subversive of well-settled legal principles, and would open the door to illimitable frauds by brokers, factors, attorneys and others, clothed with limited powers and occupying strictly fiduciary relations. (*Smith* v. *Tracy,* 36 N. Y. 79, 85; *Baldwin* v. *Burrows,* 47 N. Y. 199.) A principal, in ignorance of the agent's fraud, retains what appears to be the legitimate proceeds of a transaction. That is not enough to bind him as by a ratification. If a principal authorizes his agent to make a sale and the agent, wholly on his own responsibility, aids a buyer in embezzling the purchase money or in swindling some one out of it, the mere receipt and retention of the money by the principal in ignorance of such wrongful acts may not bind him to repay the proceeds of the theft. (*Wheeler* v. *Northwestern Sleigh Co.,* 39 Fed. Rep. 347, 351; *Foote* v. *Cotting,* 195 Mass. 55, 61; 15 L. R. A. [N. S.] 693.) We would be carrying remedial liability beyond the logic of any reported case if we charged

the defendants with responsibility for Mitchell's false promise. The peculiar doctrines of agency are not to be extended beyond the limitations of common sense.

The distinction is not, however, always readily recognized and expressed between frauds of the agent which bind the principal and those which do not. " A party dealing with an agent is bound to inquire as to the extent of his authority; but he cannot always protect himself against his frauds." (*Baldwin* v. *Burrows, supra,* p. 215.) The rule is often broadly stated that where one of two innocent parties must suffer for the fraud of a third, he who furnishes to the third party the means by which he perpetrates the fraud and receives the benefit of it must bear the loss. If, on the facts of the whole case, the conduct of the defendants toward Mitchell shows by fair inference that the act of the agent in making the promise to Deyo with the preconceived purpose of breaking it was their act either by antecedent authorization or by ratification, and that defendants are, therefore, chargeable therewith on the axiom of agency, *qui facit per alium, facit per se,* the question still remains whether Mitchell's false promises were a proximate cause; a real, direct and immediate cause, of plaintiffs' misfortune. The existence of a valid right of action does not require that such wrongful conduct should be the *sole* cause of plaintiffs' loss; it is enough to show that it was an essential cause. But if plaintiffs' own conduct was the primary and substantial cause of their loss; if they had no right to rely exclusively upon the assurance of Mitchell when they might have prevented the loss themselves, they cannot recover. While it has been said that " negligence as a defense in cases of fraud has been in danger of being pushed too far " (*Long* v. *Inhabitants of Athol,* 196 Mass. 497, 505); while the courts in such cases teach the lesson of honesty rather than the lesson of care (*Albany City Svgs. Instn.* v. *Burdick,* 87 N. Y. 40; *Western Mfg. Co.* v. *Cotton,* 126

Ky. 749; *Schumaker* v. *Mather*, 133 N. Y. 590; *Alexander* v. *Brogley*, 63 N. J. L. 307); while, if the fraud is the basis of a mutual agreement, it may well be that the incautious should be protected rather than the wicked and that negligence should not bar relief from a willful fraud, yet these rules should not be extended to make principals responsible for the instrumentalities which their agent employs in their behalf when fraud and carelessness do not meet at the inception of a contract or the consummation of a sale; when negligence follows fraud and is a succeeding and independent rather than a concurrent cause of loss.

The first cause of plaintiffs' loss was Carver's dishonesty. That a thief and gambler should reform after one easy lesson on the wickedness of amateur speculation on the stock market with the funds of clients is conceivable; that he may relapse is an existing danger. But his dishonesty alone would not defeat a recovery. (*DeLaBere* v. *Pearson*, 1907, 1 K. B. 483; affd., 1908, 1 K. B. 280.)

Another efficient cause appears. Carver could not have stolen the money with which he resumed his operations if plaintiffs had not for two years kept him in their firm with unrestricted opportunities to indulge in his weakness. A third cause was the fraud of Mitchell. Mitchell knew that Carver was an unsuccessful gambler, but Deyo did not disclose that he had been a thief, and it is difficult to assume that Mitchell should have foreseen in November, 1910, that the natural result of secrecy as to future dealings would be to make him one. A stock speculator is not necessarily a dishonest person. Mitchell knew, however, as well as any one that stock gamblers are prone to go beyond their means and involve themselves and others in ruin, and that Carver was a ruined gamester. If Mitchell did not have a mind fatally bent on mischief, he at least was recklessly indifferent to the methods which his good customer might employ in obtaining money and we may infer that he was as indifferent in that regard when

he lied to Deyo as when he took the money that Carver brought to him. A jury might say that his false representations contributed to plaintiffs' loss, but callous as he may have been, he was not its primary author. (*Jex v. Straus*, 122 N. Y. 293.) From plaintiffs the law exacted the duty of reasonable care after the false representations were made. It was not the natural result of Mitchell's promises that they should take the word of the gambler and defaulter and of the manager of the business that made profits out of all conditions of men, not excluding such as Carver, and use no further care for their own protection. By their easy confidence in Carver whom they knew, rather than in Mitchell who was comparatively a stranger, they facilitated rather than hindered their partner in his illegal operations. They should have been on their guard. They were not insured by Mitchell against loss. They had no reason to take as settled that Carver had become immune by one attack of the mania of speculation or that Mitchell would be governed by any fine sense of honor toward them. It was not as if Carver came to them as a stranger on defendants' recommendation. It was not their money which was jeopardized when they left it in unworthy hands. It was the money of clients to whom they owed a duty of more active vigilance than comes of mere reliance on promises such as these. Deyo knew that Mitchell owed his allegiance to a concern with which the highly respected and trusted law firm had no community of interest. Means of knowledge of Carver's speculations were more open to Mitchell than to Deyo. Knowledge of Carver's embezzlements was open entirely to Deyo. The stealing rather than the speculation was the immediate cause of plaintiffs' loss and the wrong of Mitchell became injurious only in consequence of plaintiffs' own subsequent omissions. (*Critten v. Chemical Nat. Bank*, 171 N. Y. 219.) Plaintiffs' conduct was in a way commendable in the consideration

they showed their erring partner, but thereby they subjected themselves to a serious risk. Their confidence was not justified. They may be charitably regarded as unfortunate rather than morally delinquent, but Carver's acts were not abnormal, as they very well knew, and their trust in him was the final decisive cause of their loss.

The special verdict separates the damages so as to state the amount of Carver's embezzlements from each of a number of clients, but this action is not brought to trace trust funds and the judgment cannot be sustained on any such theory.

It follows that the judgment appealed from must be reversed and the judgment of nonsuit be affirmed, with costs in this court and in the Appellate Division.

HISCOCK, Ch. J., CHASE, HOGAN, CARDOZO, McLAUGHLIN and ANDREWS, JJ., concur.

Judgment reversed, etc.