### REPUBLIC OF ITALY v. DE ANGELIS et al.

United States District Court,
S. D. New York.
Aug. 19, 1952.

Edward Garfield, New York City, for plaintiff, Robert H. Wrubel, New York City, of counsel.

Hahn & Golin, New York City, for defendants, Reuben Golin, Alfred W. Bressler, New York City, of counsel.

WEINFELD, District Judge.

These are two motions, one by the individual defendant Anthony DeAngelis (hereinafter called DeAngelis) and the other by the partnership defendant composed of said Anthony DeAngelis and his wife Virginia (hereinafter called the DeAngelis partnership), to vacate attachments against their respective assets previously obtained by plaintiff pursuant to the attachment procedure authorized under the New York Civil Practice Act. The motion in each instance is based upon the papers upon which the warrant was granted pursuant to Sections 948 and 949 of the New York Civil Practice Act made applicable by Rule 64 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

The plaintiff, although contending that the papers are sufficient and that no jurisdictional defect exists which requires the vacatur of the attachments, has submitted and requested the Court to receive supplemental affidavits pursuant to Section 822 of the New York Civil Practice Act, which provides:

"* * * If the application to vacate be to the court or a judge thereof, * * * this act shall not prevent the court or judge, in furtherance of just-

tice, from allowing new proof, in behalf of the party opposing the application, to supersede or supply defects in the original proof, though the application to vacate be founded only on the papers on which the order or warrant was granted. * * * "

■ I have decided to accept the additional affidavits tendered by the plaintiff. These serve to clarify matters adverted to in the original papers, and the disposition made of the major motion is not affected by their inclusion. Section 822, first adopted in the Civil Practice Act, was intended, in conjunction with Section 105 of the Act, to liberalize consideration of applications to vacate warrants of attachment and to relax the rigidity with which Courts had determined such applications under the predecessor Code of Civil Procedure.[1]

The complaint which constituted part of the papers upon which the attachments were granted contains three separate claims: One against DeAngelis; a second against the DeAngelis partnership; and a third against Adolph Gobel, Inc., which is not involved in the present applications. Since the two motions to vacate involve different moving parties, different causes of action, different grounds upon which the attachments were granted and different grounds upon which vacatur of the attachments is sought, they will be treated separately. We consider first the application of the individual defendant DeAngelis.

The suit stems out of four contracts entered into by plaintiff's representative in this country, the Italian Technical Delegation, with the DeAngelis Corporation, not a defendant herein, for the purchase of 5,300 tons of tallow, of which only 300 tons were delivered. The first count of the complaint states a claim against DeAngelis upon his express agreement to assume individual liability for losses sustained by plaintiff by reason of the breach of the four contracts by DeAngelis Corporation (in addition to the liability of said corporation). The attachment was obtained under Section 903, subd. 6, of

the New York Civil Practice Act which authorizes the provisional remedy against the property of a defendant where "In an action upon contract, express or implied, [he] has been guilty of a fraud in contracting or incurring the liability."

■■ The affidavits upon which the attachment was granted indicate substantially the following: that in September 1950, during the course of negotiations for the purchase of tallow, DeAngelis, principal stockholder and executive officer of the DeAngelis Corporation, represented that his company was a going concern operating a meat processing plant in North Bergen, New Jersey, with a very large capacity for producing tallow sufficient to meet the requirements of the plaintiff. Immediately thereafter and in the month of September 1950, three contracts, and in November 1950, a fourth contract, were entered into with the DeAngelis Corporation for the purchase by the plaintiff from the DeAngelis Corporation of 5,300 tons of tallow; that these purchases were made in reliance upon such representations; that the representations were later renewed in the form of statements made in explanation of non-deliveries under the contracts, in one instance the DeAngelis Corporation stating over the signature of DeAngelis, its president, that commitments to the United States Government had prevented it from "making shipments from our plant in New Jersey"; that by reason of the repeated representations, plaintiff's agents continued to believe that the DeAngelis Corporation was a going concern, capable of fulfilling its contract commitments to plaintiff.

It now appears that the DeAngelis Corporation, acting principally through DeAngelis, at the very time it entered into the first three contracts was, and for some time prior thereto had been, engaged in the process of disposing of all its inventory, merchandise, equipment, processes and formulæ to Adolph Gobel, Inc. and surrendering the unexpired portion of its lease of the processing plant in North Bergen, New Jersey, to the DeAngelis partnership, which

1. Auditore v. Cantanzaro, 117 Misc. 253, 192 N.Y.S. 191; Bloom v. Wrought Iron Novelty Corp., 128 Misc. 460, 219 N.Y.S. 92.

was the owner and lessor thereof; that at the time the fourth contract was entered into in November 1950, dissolution papers for the corporation had been previously executed on October 31, 1950, which were subsequently filed and the corporation dissolved. In any event, by the end of October 1950, when the bulk of the deliveries were yet to be made under the four contracts, the DeAngelis Corporation had ceased to exist as a going concern. These facts were not disclosed by DeAngelis to plaintiff's representatives.

The first three contracts specified delivery at the seller's option in October, November and December 1950, and the fourth in December 1950, January and February 1951, with a thirty day grace period. With the exception of the 300 tons of tallow delivered in October, no other deliveries were made.

The DeAngelis Corporation in December 1950 sought an extension of delivery dates. (It was on this occasion that DeAngelis stated the seller's commitments to the United States Government were · "preventing us from making shipments from our plant in North Bergen".) The request was refused. Thereafter, when the defendant failed to make deliveries by the end of December and it was evident that there would also be noncompliance with the terms of the fourth contract, plaintiff's representatives and DeAngelis met in a conference on January 29, 1951, which resulted, as plaintiff alleges, in the contract set forth in the first count of the complaint, on the basis of which, and of representations then made by DeAngelis, the attachment was procured.

The affidavits further aver that at this conference DeAngelis acknowledged that the DeAngelis Corporation was in default under the four contracts and stated that its inability to make the balance of deliveries was due to financial difficulties; that he requested a ten day extension to make financial arrangements which would permit performance of the contracts and delivery of the tallow by the DeAngelis Corporation; that in consideration of the ten day ex-

tension, which was granted, he assumed personal liability for any defaults under the contracts, and in the event of continued default following the extension, the plaintiff was authorized to buy the undelivered balance of tallow in the open market at prevailing prices and DeAngelis assumed individual liability for any loss sustained. A written memorandum, the nature and effect of which the defendant disputes, was signed by all present, including DeAngelis. It · contains enough upon which plaintiff may predicate its claim asserted against the defendant in the first count. Corroboration that an agreement was entered into by him on January 29th is contained in his letter of March 2, 1951, on which day Adolph Gobel, Inc., of which he was then majority stockholder and president, sold to plaintiff at prices considerably in excess of the original contract price a substantial portion of the defaulted deliveries of tallow.

The plaintiff, for the purposes of this motion, has sustained its burden of establishing a prima facie cause of action for breach of contract and in this respect has met the first · requirement of the right to attachment under Section 903, subd. 6, of the New York Civil Practice Act. The contentions that the memorandum of January 29, 1951, fails to show any manifestation of intent by DeAngelis to enter into binding obligations and that plaintiff failed to show that any consideration was given for the contract upon which the action rests, are based upon disputed issues of fact which need not be determined on this motion. ²

But, in addition to establishing that it has a prima facie cause of action in contract, plaintiff, to sustain the attachment, must also show under Section 903, subd. 6, of the New York Civil Practice Act that the defendant "has been guilty of a fraud in contracting or incurring the liability." And it is here that the defendant centers his principal attacks. First he contends that the original affidavits are fatally defective in that plaintiff has failed to establish those elements that are basic in an ac-

2. Bart-Parker Co., Inc. v. Dictograph Products Co., Inc., 258 App.Div. 638, 17 N.Y.S.2d 588.

tion for fraud and deceit: representation, falsity, scienter, reliance and damage.[3]

On January 29, 1951, when DeAngelis secured the ten day extension and agreed to make good plaintiff's losses in the event of continued non-delivery, he again failed to disclose to, and continued to conceal from, plaintiff's representatives the true status of the DeAngelis Corporation: that instead of being an active organization it was non-existent and had been completely denuded of all its assets. The continued operation and existence of the DeAnglis Corporation as a going and functioning concern, capable of either acquiring or processing the tallow to meet deliveries under its contracts with plaintiff and possessed of legal status to undertake necessary legal commitments was material. The failure to disclose the pertinent facts with respect to the transfer of its machinery, equipment and inventory and its dissolution constituted fraud upon the plaintiff. Clearly, DeAngelis was aware, and the papers so establish, that the Italian Government was interested in securing the tallow to meet its requirements.[4] It was not a merchant engaged in a commercial venture seeking a profit through these contracts.

▌ As to the element of reliance, the papers also sufficiently establish that at the time of the conference of January 29, 1951, the members of the plaintiff's representative continued to believe that the DeAngelis Corporation was a functioning concern; that they did not discover the true state of affairs until February 5, 1951; that had they been advised at the time that all the assets of the DeAngelis Corporation had been disposed of and that it had been dissolved, they would not have entered into the agreement and granted the extension but would have immediately purchased in the open, and then rapidly spiralling, market the remainder of the tallow, which in the period from January 29th to the date of discovery, all within the ten day extension period, could have been acquired at prices reducing plaintiff's ultimate costs by $125,000.

Defendant urges that the disclosure at the conference that the DeAngelis Corporation was in financial difficulty rebuts any claim that plaintiff relied upon the non-existence of the concealed facts in entering the agreement and granting the extension and that, in any event, such facts were immaterial. But what was concealed was not merely the financial problems of the corporation such as may now and then beset an operating organization, but rather its utter financial and legal incapacity. The statement that the corporation was in financial straits was implicit with the suggestion that its problems lent themselves to solution within the extension period. This is quite different from a revelation that the corporation was completely defunct. Disclosure of the concealed facts would have indicated a lack of present intention as well as present ability to remedy the default and comply with the agreements.[5] A corporation in financial difficulties has various ways to raise funds and otherwise meet its problems, whereas, a non-existent corporation is without power to make commitments, obtain credit, pledge assets, or, indeed, to function at all except under conditions not here pertinent. It was the same as if the defendant, concealing the fact that a primary obligor was dead, and, hence, knowing that performance could not take place, had procured an extension of time for the deceased to perform under the contract as to which the latter was then in default.[6]

▌ The defendant also attacks the papers as fatally defective in that they fail to show that any damages were suffered by plaintiff by reason of the defendant's fraud from the date of concealment on January 29, 1951, to February 5, 1951, the date of discovery of the fraud; that,

3. Reno v. Bull, 226 N.Y. 546, 124 N.E. 144.

4. Schroeder v. Schroeder, 269 App.Div. 405, 56 N.Y.S.2d 36; Restatement of the Law of Torts, Section 530, Comment (c).

5. Adams v. Gillig, 199 N.Y. 314, 92 N.E. 670; Deyo v. Hudson, 225 N.Y. 602, 122 N.E. 635; See Restatement of the Law of Torts, Section 530.

6. Compare Fletcher Cyclopedia Corporations, Section 8113 (1942).

in any event, such damages as might have been suffered were trivial and insignificant. We need not pass upon his contention that the allegation and proof of general damages in excess of $800,000 resulting from the breach of the contract, measured by the difference between the contract price and the prices at which plaintiff finally "bought in," may not be used to support the attachment. The affidavits show a constantly rising market in which plaintiff was compelled to purchase the tallow and that the damages which were suffered after January 29, 1951, amounted to almost $125,000. The original affidavits and the supplemental affidavit contained sufficient evidential facts as to damages. The affiants appear qualified to express opinions as to market values. Whether damages be controlled by those applicable to breach of contract or those resulting from the fraud in contracting the liability, sufficient evidentiary proof has been offered so that under either theory they are reasonably certain and not speculative.[7] If, in fact, as defendant contends, the actual damage is trivial and plaintiff has levied upon property greatly in excess of the amount necessary to satisfy the plaintiff's demand, a proper remedy is provided under Section 942 of the New York Civil Practice Act.

■ The defendant next urges that since plaintiff seeks to recover damages for breach of the contract of January 29, 1951, and not for fraud in the making of the contract of that date, it follows that the liability exists because of the contract rather than the fraud, and, accordingly, the attachment should not have been granted under subdivision 6 of Section 903 which, as already noted, permits the issuance of an attachment in an action on the contract where the defendant "has been guilty of a fraud in contracting or incurring the liability." The defendant's thesis appears to be that, to uphold the attachment, the liability must flow directly from the fraud and not the contract, the making of which was induced by the fraud. Quoting the defendant, his position is that "plaintiff is trying to recover, not the value of what it has lost by defendant's fraud, but what it has lost by defendant's alleged breach of contract. There is simply no connection between the damages flowing from that breach—the liability sued on—and the damages flowing from defendant's alleged fraud."

I believe the defendant has read the word "liability" appearing in subdivision 6 of Section 903 as relating exclusively to the fraud in incurring or making the contract rather than liability with relation to the contract. To uphold this construction would mean that a plaintiff who has entered into a contract induced by defendant's fraud would have to forego the right of attachment specifically granted unless the damages in the action for breach of the contract equalled those arising from the fraud in inducing the contract. Indeed, the defendant makes precisely that argument, for he urges that normally where the attachment is obtained on the ground that the defendant has been guilty of fraud in contracting the liability sued on, the damages caused by the fraud are co-extensive with the damages alleged in the complaint. A sufficient answer to this claim in the instant case is that while the damages for the fraud do not equal those alleged under the breach of contract, they are, nonetheless, substantial—and this circumstance alone distinguishes this case from Novotny v. Kosloff, 159 App.Div. 478, 144 N.Y.S. 652, affirmed 214 N.Y. 12, 108 N.E. 189, relied upon so heavily by the defendant. The opinion makes it pointedly clear that in that case the plaintiff suffered no damages by reason of the fraud in inducing the contract. The Novotny case was decided many years prior to the enactment of subdivision 6 of Section 903, which was intended to broaden the grounds warranting attachment to including "other types of fraud antecedent to the making of a contract or incurring a liability" and "any fraud in contracting."[8] Moreover, the focus of the Novotny case was on Section 826, subd. 9, which pertains to the

---

7. See Shapiro v. Loft, Inc., 142 Misc. 144, 254 N.Y.S. 197.

8. The New York Judicial Council, 7th Annual Report, 1941, p. 409, Note 76.

provisional remedy of arrest.[8a] Defendant's contention that Sections 903, subd. 6, and 826, subd. 9, are to be construed in pari materia is weakened by the requirements of Section 826, subd. 9, that the fraud must be alleged in the complaint and proved at the trial if the plaintiff is to recover at all. Furthermore, Section 903, subd. 5, uses language which reaches the result contended for by the defendant. A right of attachment is granted thereunder where one has made a false statement in writing and an action is brought "to recover damages * * * where the *liability arose in whole or in part in consequence of the making of the false statement.*" (Emphasis supplied.) Had a similar restriction on plaintiff's right to attachment been intended under subdivision 6 of Section 903, it would seem there would have been little difficulty in accomplishing that result. For these reasons the Novotny case *does not seem dispositive* of the point at issue.

 I have given consideration to all the contentions advanced in the very voluminous briefs submitted. The argument that plaintiff was eager to obtain the defendant's personal guarantee in return for the ten day extension and that the concealment was, therefore, immaterial since, in any event, it was more desirable for plaintiff to have the defendant's personal obligation; the claim that plaintiff's plea of lack of knowledge of the true state of affairs of the corporation is incredible and unbelievable; the alleged "inherent implausibility of plaintiff's factual case;" these and many of the other arguments of the

defendant might properly be advanced when the issues are presented for final determination, but they have little or no bearing on this motion to vacate the attachment, made, as it is, on the original papers. The versions of the affiants supporting plaintiff's claim and the grounds for the attachment not only do not appear incredible but are, in fact, supported by documentary proof. In any event, the Court on this application does not weigh the facts or decide the merits of the controversy as on a trial.[9] The New York law is well settled that on a motion of this character the original papers should be liberally construed in support of the attachment and the plaintiff given the benefit of all the legitimate inferences and deductions that can be drawn from the facts stated.[10] Chief Judge Learned Hand summarized the applicable law as enunciated by the New York Courts as "the attachment will not stand, if the papers upon which it 'was based * * * clearly indicate that the plaintiffs must ultimately fail.' (Citing cases.)"[11] The Court cannot say as a matter of law on this record that the plaintiff must ultimately be defeated.[12]

The motion to vacate the attachment as to Anthony DeAngelis is denied.

 We next consider the motion made on behalf of the DeAngelis partnership.

The second count asserts a tort claim against the DeAngelis partnership, Adolph Gobel, Inc. and Virginia DeAngelis, for intentionally inflicting damages upon plaintiff, without justification. It charges that they, together with Anthony DeAngelis (named as a conspirator but not as a de-

**8a.** Traditionally, the courts have been vigilant to make certain that the provisional remedy of arrest, authorized in specific instances of fraudulent conduct, was not used as a substitute for imprisonment for debt. Compare the New York Judicial Council's recommendation that section 826 be repealed. 12th Annual Report, 1946, p. 347.

**9.** Bard-Parker Co., Inc. v. Dictograph Products Co., Inc., 258 App.Div. 638, 17 N.Y.S.2d 588.

**10.** United States v. Brown, 247 N.Y. 211, 217, 160 N.E. 13; Stewart v. Lyman, 62 App.Div. 182, 70 N.Y.S. 936; Makepeace v. Dilltown Smokeless Coal Co., 179 App. Div. 60, 166 N.Y.S. 92; Bard-Parker Co., Inc., v. Dictograph Products Co., Inc., supra, footnote 9; Bernstein v. Van Heyghen, 2 Cir., 163 F.2d 246, certiorari denied 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357; Ecco High Frequency Corporation v. Amtorg Trading Corp., Sup., 81 N.Y. S.2d 610, 612, affirmed 274 App.Div. 982, 85 N.Y.S.2d 304, leave to appeal denied 274 App.Div. 1056, 86 N.Y.S.2d 465.

**11.** Bernstein v. Van Heyghen, 2 Cir., 163 F.2d 246, 248, certiorari denied 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357.

**12.** See American Reserve Insurance Co. v. China Insurance Co., 297 N.Y. 322, 79 N.E.2d 425.

fendant in this count) and the DeAngelis Corporation (not sued herein), engaged in a continuing conspiracy and perpetrated a fraud upon the plaintiff by fraudulently inducing it to enter into the four purchase contracts with the DeAngelis Corporation, on the basis of the misrepresentations referred to therein; that they induced the breach of said contracts by the DeAngelis Corporation; that they intended to prevent plaintiff from obtaining redress for its loss by fraudulently transferring assets of the DeAngelis Corporation and the DeAngelis partnership beyond the reach of creditors, including the plaintiff. The attachment was granted against the DeAngelis partnership under Section 903, subd. 3, of the New York Civil Practice Act on the ground that the partnership assigned, disposed of and secreted property with intent to defraud its creditors and made fraudulent transfers and conveyances of its property and incurred obligations fraudulently within the meaning of Sections 273, 275, 277 and 278 of the Debtor and Creditor Law of the State of New York, McK.Consol.Laws, c. 12.

I do not reach many of the questions posed by the parties. I find that the original papers fail to set forth evidential facts sufficient to support the claim asserted in the second count against the partnership. Section 903 of the New York Civil Practice Act specifically requires that to entitle the plaintiff to a warrant of attachment upon the grounds specified therein, he must show that a cause of action exists against the defendant. Merely incorporating the complaint by reference, although it may state a claim in terms of ultimate fact as a matter of pleading, does not supply the necessary evidential proof to sustain the claim.

 "* * * it is not sufficient that the papers upon which the attachment was procured set out the ultimate facts showing the cause of action or the grounds. Evidentiary facts making out a prima facie case proving such facts must be shown. Knorr v. New York State Mut. Ben. Ass'n, 79 Hun. 83, 29 N.Y.S. 508; Hart v. Page Mfg. Co., 187 App.Div. 296, 175 N.Y.S. 502; Lamborn v. Lake Shore Banking &

Trust Co., 231 N.Y. 616, 132 N.E. 911, affirming 196 App.Div. 504, 188 N.Y.S. 162; Makepeace v. Dilltown Smokeless Coal Co., supra. To sustain an attachment, evidence tending to support the allegations of the complaint must be found in the papers upon which the attachment is based and affidavits in support of an attachment must contain evidence from which the court can determine that the ultimate facts stated in the pleading can be substantiated. [Citing cases.]" Ecco High Frequency Corporation v. Amtorg Trading Corp., Sup., 81 N.Y.S.2d 610, 612–613, affirmed 274 App.Div. 982, 85 N.Y.S.2d 304.

True, conspiracy charges are rarely susceptible of direct proof and generally are established by circumstantial evidence. But, the papers are barren of any basic fact relating the partnership to the alleged conspiracy and which would permit the necessary inferences of the partnership participation to be drawn therefrom. The proof may exist but it has not been submitted.

The motion made on behalf of the DeAngelis partnership to vacate the attachment is granted.

Settle order on notice.