UNITED NATIONS KOREAN RECONSTRUCTION AGENCY, Plaintiff,

v.

GLASS PRODUCTION METHODS, Inc., Lyon McCandless, Clare Paquin (also known as Clare P. McCandless) and Edmund P. McQueen, Defendants.

UNITED NATIONS KOREAN RECONSTRUCTION AGENCY, Plaintiff,

v.

FRAZIER–SIMPLEX, INC., Defendant.

United States District Court
S. D. New York.
May 26, 1960.

See, also, 143 F.Supp. 248.

Berle, Berle & Brunner, New York City, for plaintiff; Thorold J. Deyrup, Robert H. Seabolt, New York City, of counsel.

H. A. and C. E. Heydt, New York City, for defendant, Glass Production Methods, Inc.; J. David Silvers, New York City, of counsel.

Goldstein, Judd & Gurfein, New York City, for defendant. Frazier-Simplex, Inc.; Murray I. Gurfein, Robert J. Haft, New York City, of counsel.

WEINFELD, District Judge.

This is a consolidated action wherein plaintiff, United Nations Korean Reconstruction Agency, an agency of the United Nations, hereafter referred to as "UNKRA," seeks to recover $900,000 damages from two corporate defendants. The controversy centers about a contract dated June 25, 1954, for the design and construction of a flat glass plant in the Republic of Korea, the signatories to which were UNKRA and the defendant, Frazier-Simplex International Corporation, hereafter called "International."[1] Although the defendant Frazier-Simplex, Inc., hereafter referred to as "Simplex," was not a signatory to the agreement, the plaintiff seeks to hold it liable thereunder by virtue of alleged actual or apparent authority of International to execute the agreement on its behalf.

Plaintiff also seeks to fasten liability upon International on the claims that (1) through Lyon McCandless,[2] International's principal executive officer, it falsely represented it was authorized by Simplex to enter into the agreement; and (2) breach of warranty of authority to execute the agreement on behalf of Simplex.

Following the execution of the June 1954 agreement, when Simplex disclaimed liability thereunder, representatives of UNKRA and Simplex entered into negotiations which eventuated in an agreement on January 10, 1955. Simplex was a signatory to this agreement, as was International.[3]

Simplex, apart from a denial that it was bound by the June 1954 agreement, urges that the execution of the January 1955 agreement effected a complete discharge of all liability under the first agreement, or, alternatively, an executory accord.

UNKRA, not only challenges the claimed legal consequences of the second agreement, but charges that it is void— that its execution was induced by fraudulent concealment by Simplex of the true facts of its relationship to International. Accordingly, plaintiff predicates its claim to relief upon the first, the June 1954, agreement.

International, in addition to a denial that it made the alleged misrepresentations or any warranty of authority, as charged in the complaint, also interposed affirmative defenses of novation, account stated, accord and satisfaction, waiver, release, laches and estoppel. These are based in part upon the second agreement and upon events which occurred subsequent thereto.

The events about which the various claims and defenses revolve fall within distinct periods:

(1) From November 1952, when UNKRA wrote to Simplex, inviting its interest in the construction of a flat glass plant in Korea, to January 1954, when International submitted a survey

---

1. International was sued herein under its present name, Glass Production Methods, Inc., but since International was a party to the agreement and all transactions among the litigants were conducted under that name, it is retained for convenience.

2. McCandless was originally named as a defendant, but the action as to him and

another individual defendant was severed and transferred to the District Court of Connecticut.

3. Frazier-Simplex Korea, Inc., the assignee of International, also was a signatory.

report to plaintiff on the feasibility of such a project.

(2) Thereafter and up to the end of May 1954, when Simplex and International exchanged views on suggested proposals relative to a contemplated contract with UNKRA for the design and construction of the glass plant as outlined in the survey report.

(3) June 7, 1954 to June 25, 1954, when McCandless and UNKRA representatives, in Korea, negotiated and finally agreed upon the terms of the contract signed on June 25, 1954.

(4) July 1, 1954 to July 26, 1954, during which International negotiated for Simplex's performance of the design work as specified in the June 1954 contract. These negotiations eventuated in Simplex's rejection of any part of the work involved in the contract.

(5) The period from October 19, 1954, when UNKRA's representative was first informed by Simplex that it did not consider itself bound by the June 1954 contract, following which negotiations were carried on, to January 10, 1955, when the second agreement was signed.

(6) The further period subsequent to January 10, 1955, when the defendants assert that plaintiff, with full knowledge of all material facts, performed other acts which in any event bar recovery.

*November 1952 to January 1954*

All parties are in agreement that Simplex enjoyed a world-wide reputation as an engineering firm in the design and construction of plants, machinery and equipment for the manufacture of flat and other types of glass.

UNKRA, as part of its reconstruction program for Korea, desired to construct a flat glass factory there. Its first problem was to determine the feasibility and the approximate cost of such a plant, and this required the services of an experienced engineering firm to make a general survey. If feasible, there remained the matter of design, procurement, construction and supervision. Aware of Sim-

plex's international reputation, UNKRA wrote to it in November 1952, inquiring whether it was equipped to render such services. Simplex neither acknowledged nor replied to the letter. Instead, it forwarded UNKRA's inquiry to International, which, in reply, asked some general questions about conditions pertaining to the erection of a glass plant in Korea, and also enclosed a general descriptive brochure of Simplex's activities. This was the initial contact between International and UNKRA.

International and Simplex were then under a five-year agreement, due to expire in December 1954, whereby Simplex had appointed International "its exclusive agent and sales representative throughout the world * * *." [4] The latter, on its part, was "to solicit and negotiate for the sale of contracts for the design and construction * * * of glass plants * * *." However, there was reserved to Simplex "the right to refuse to accept any business submitted to it." International had been supplied by Simplex with brochures and other advertising material which contained on the cover and title page the legend:

"Frazier-Simplex, Inc.
Engineers
* * *
Outside the U.S.A.

Frazier-Simplex International Corp."
Many of the inside pages referred only to Simplex.

Lyon McCandless, International's chief executive officer, appears to have been the principal, if not the sole contact with UNKRA's representatives. In the preliminary stage, their negotiations related to a survey to determine the feasibility of the proposed project.

Shortly after the initial contact with McCandless, UNKRA requested information as to the personnel and experience of International and Simplex. McCandless thereafter forwarded to UNKRA considerable details of many glass projects which had been constructed by Sim-

4. (Excepting the United States and other described areas. South Korea was not included within the exception.)

plex here and abroad, and essentially set forth the experience of Simplex and its personnel. The listing of officers included those of both Simplex and International. Much of the information had been furnished by Simplex to McCandless for use in answering the questionnaire.

UNKRA, evidently satisfied that it was dealing with an experienced and fully qualified organization, then actively negotiated with McCandless the terms of a survey contract. While these activities were in progress, International and Simplex (unknown to UNKRA) exchanged views on various proposals relative to the suggested glass plant. Simplex, doubtful of its practicability, questioned many of its features. Consequently, it advised International that it was free to handle the matter on its own, although it indicated a willingness to undertake the design engineering work upon an equitable basis.

In August 1953, International was awarded the survey contract. At the end of January 1954, it submitted its printed report to UNKRA. The title and every other page of the report bore the legend:

"Frazier-Simplex, Inc.
Engineers
* * *
Outside the U.S.A.

Frazier-Simplex International Corp."

A copy of this report was also submitted to Simplex.

International and UNKRA then entered upon negotiations for the design and construction of the plant as generally recommended in the survey report. International, to further its negotiations with UNKRA, sought from Simplex an estimate for its design and engineering services. After much exchange of correspondence, Simplex indicated it would take the work for a fixed fee of 10% of the estimated cost, or $188,650. This written proposal was one of several alternatives on the subject, but was not acted upon.

However, McCandless testified that before he left for Korea, he had an oral commitment from Simplex to do the de-sign and engineering work for $193,000, later confirmed by letter, but no such letter was ever produced, nor was a satisfactory explanation offered for its absence. His statement that he had shown this letter in Korea to General Eastwood, one of plaintiff's representatives, was categorically denied.

*June 7, 1954 to June 25, 1954*

McCandless arrived in Korea on June 7, 1954, in response to UNKRA's request for "an officer of Frazier-Simplex Corporation * * * empowered and authorized to negotiate and sign" an all inclusive contract for the design, procurement and construction of the glass factory.

He there negotiated the contract with various officials of UNKRA until June 25, 1954, when it was signed. During the course of these negotiations, whenever controversy arose on major issues, McCandless repeatedly alluded, in rather positive terms, to the views and preferences of the "old man," as he referred to Chauncey Frazier, apparently the key and dominant figure in Simplex. Many such controverted items were resolved on the basis of deference to the "old man's" decided opinions, as represented by McCandless.

Again and again, McCandless in essence stated that Simplex and International were one and the same company; that Simplex did business overseas as International; that International had been formed to avoid tax consequences.

When negotiations reached the final stage and the contract was ready for signature, McCandless was specifically asked the correct name of the contracting corporation, which had been left blank in the draft, and he gave the name of International, stating, what he had represented on many other occasions, that that was the way Simplex did business overseas. Accordingly, the agreement for the design, procurement and construction of the glass factory was signed on June 25, 1954, with UNKRA and International as the parties thereto.

The issues of authority and apparent authority under the claims against Sim-

plex, and the issues of fraud and breach of warranty of authority as against International, generally can be decided within the framework of the foregoing broad outline of facts.

However, since UNKRA also contends that events subsequent to June 25, 1954 establish ratification by Simplex, it is desirable to consider these matters at this point.

### July 1, 1954 to July 26, 1954

Several days after the contract had been signed, International submitted a copy to Simplex for its consideration of the design work. There followed conferences and exchange of correspondence in which Simplex requested certain information with respect to matters which were specified in the contract. There were proposals and counter-proposals with reference to the design work.

On July 15, Simplex advised International that it would perform the basic design work for $193,000, with an increased price if UNKRA required a producer gas plant and tank furnace adapted to oil and enriched producer gas firing. This proposal was not accepted. Instead, on July 22, International sent to Simplex its own specifications which it deemed "a little more comprehensive," together with a check for $35,005.91, representing an advance payment for services to be rendered under its "Revised Specifications."

However, on July 26, 1954, Simplex rejected "any part of the business involved in the contract between United Nations Korean Reconstruction Agency and Frazier-Simplex International Corp.," and returned the latter's check for $35,-005.91. The basis of rejection was Simplex's view that a plant fired by oil and enriched producer gas system, requiring the use of Korean anthracite coal, was experimental. Lacking confidence in its success, it was unwilling to commit itself thereto, in view of a guaranty of performance contained in the contract. Simplex was also concerned about the

high water level of the project which involved additional design expense, a matter which, as in the case of the use of anthracite coal, it had commented on even before the June contract had been signed.

The foregoing, in broad outline, is the substance of the subsidiary facts as found by the Court and upon which, in large measure, the ultimate findings must be based.[5] The Court has not attempted to detail all matters as to which controversy exists, and which one or another of the parties has pressed as pertinent on the issues. It has, however, fully considered the various contentions.

After careful review of the trial transcript, the Court's summary of trial notes, the extensive exhibits, and upon observation of the witnesses, the Court finds:

█ 1. That International did not have actual authority to execute the agreement of June 25, 1954, on behalf of Simplex. While it is true that the agency agreement between Simplex and International gave the latter the right to solicit and negotiate a contract, Simplex also had the right of refusal, which it exercised. The evidence is insufficient to support the claim that Simplex made a firm commitment to International to do the design work for $193,000, the amount specified for Title I of the June 1954 agreement, either before or after the execution of the agreement.

Apart from this, the alleged commitment related only to design and engineering work, whereas the contract which International executed went much beyond; it required procurement of materials, construction of the plant and its supervision for one year after completion, as well as certain guaranties of performance.

Neither is there adequate proof that subsequent to the agreement, Simplex, with full knowledge of the facts, ratified it.

█ 2. Simplex, by its acts and conduct prior to June 25, 1954, conferred

5. Cf. Kelley v. Everglades Drainage District, 1943, 319 U.S. 415, 420, 63 S.Ct. 1141, 87 L.Ed. 1485; Dearborn Nat. Cas.

Co. v. Consumers Petroleum Co., 7 Cir., 1947, 164 F.2d 332, 333.

apparent authority upon International to execute the agreement of June 25, 1954, and UNKRA relied upon, and was justified in relying upon, the apparent authority of International to enter into said agreement. The apparent authority stemmed from either affirmative acts of Simplex, its acquiescence in the acts of International, or its silence with respect to known conduct of International.

First, the original communication of November 13, 1952, by UNKRA, inquiring as to its interest in the flat glass project in Korea, and requesting printed material, was addressed to Simplex. Simplex, without in anywise advising UNKRA of the nature of its relationship to International, turned the letter over to International for response.

In this circumstance, UNKRA understandably was led into the belief that International, through McCandless, was speaking for Simplex. This view is reinforced when it is noted that UNKRA, shortly after McCandless had been put in touch with it by Simplex, addressed a second letter to Simplex at Washington, Pennsylvania, "Attention Mr. McCandless," and requested certain technical information before proceeding further in the negotiations. Again, Simplex did not respond directly, but turned it over for reply to McCandless, who furnished the requested information, which led to continued negotiations.

The apparent authority is underscored by the advertising material and brochures furnished by Simplex to International, bearing the names—

"Frazier-Simplex, Inc.
Engineers
*   *   *
Washington, Pennsylvania
Outside the U.S.A.
Frazier-Simplex International Corp.
*   *   *
New York 17, New York."

Such a brochure was submitted to UNKRA in the early stages of the re-lationship between it and International. Simplex was fully aware that it had been submitted; indeed, the very purpose of the brochures was to aid International to solicit and negotiate contracts for the design and construction of glass plants under the agency agreement.

Finally, when International completed its survey report early in 1954, every page of it contained the legend described above. Following its submission to UNKRA, a copy was also sent to Simplex.

Under all these circumstances, it is abundantly established that the appearance of authority in International was created by, and with the consent and acquiescence of, Simplex.[6]

In short, Simplex, having authorized International to describe itself as an organization affiliated with it "outside the United States," should have realized that it was bound to create the belief of authority on the part of International to handle all business outside of the United States, and it cannot now be heard to complain that UNKRA relied thereon.

As far as International is concerned, the evidence, already referred to in broad outline, fully establishes that McCandless fraudulently misrepresented the relationship between International and Simplex. To be sure, McCandless specifically denied the statements attributed to him, that he made any representations, as testified to by plaintiff's witnesses, but I find to the contrary.

McCandless arrived in Korea, pursuant to plaintiff's request to send "an officer of Frazier-Simplex * * * empowered and authorized to negotiate and sign" an all inclusive contract for the design, procurement and construction of the glass factory. Understandably, in view of the existing relationship, the message was sent to International. Shortly after his arrival, McCandless was introduced to the Prime Minister and other high officials of the Korean Government, as "Vice President of Frazier-Simplex, the

6. Cf. Mullen v. J. J. Quinlan and Co., 1909, 195 N.Y. 109, 87 N.E. 1078, 24 L.R.A., N.S., 511; Durst v. Burton, 1872, 47 N.Y. 167; Restatement, Agency 2d § 27 (1958).

premier glass plant designers of the world," a position which he did not hold, but which he did not disavow at any time to UNKRA representatives.

McCandless' purpose was to reap the benefits of the entire contract for the construction of the glass plant by taking it on behalf of International and then subcontracting the design portion to Simplex. However, this he failed to disclose, but deliberately misled plaintiff's officials by representing that International was the overseas branch of Simplex, and that in effect they were one and the same.

Such representations were false, known to be false, and made with the intention that plaintiff's representatives would rely thereon,[7] which indeed they did, although, to be sure, they were certainly gullible.

The calculating nature of McCandless is highlighted by his false statement that a certificate of authority, which had been requested when the contract was about to be signed, must have been purloined; he even went through the pretense of searching for it—a palpable fraud, since he had no certificate of authority while in Korea.

It is true that at times there were references to International as a subsidiary of Simplex, but the basic and dominant representation which McCandless made was that the two corporations were essentially a single unit, of which International was the overseas branch for tax purposes. The same evidence which supports a finding of fraud also supports a finding that McCandless impliedly warranted that International had authority to bind Simplex.

█ With each, Simplex, as well as International, found bound under the June 1954 agreement, we turn to plaintiff's attack upon the January 1955 agreement. This, plaintiff claims, is void by reason of Simplex's alleged fraud, and, in consequence, urges that Simplex is still liable under the first agreement.

*October 19, 1954 to January 10, 1955*

In October 1954, information (incidentally, by way of rumor) came to UNKRA's attention, which cast doubt as to whether in fact Simplex was the party with whom it had contracted. Thereupon, General Coulter, Agent General of UNKRA, on October 19, 1954, conferred with Simplex representatives at the Simplex office at Washington, Pennsylvania. The claim of fraud is predicated essentially upon what allegedly was said or omitted by Simplex officials at that meeting.

It was the first direct contact between any representatives of plaintiff and Simplex officials. General Coulter was informed that Simplex and International were working under an agreement under which Simplex had a first refusal right; that McCandless had gone to and returned from Korea without reference to Simplex and without its authority; that he had signed the June 1954 contract without first submitting it to Simplex; that certain features of the agreement, such as the design, firing system, warranty, and design fee provisions were not acceptable to Simplex; that unless changes were made, Simplex would not participate. In sum, Coulter was advised that under the circumstances, Simplex did not consider itself bound.

The essence of the fraud charge is that Simplex falsely disclaimed that it was bound by the June 1954 agreement; that it failed to disclose the true and full terms of its agency agreement with International; that it failed to disclose the course of dealings between it and International, both before and after the execution of the June 1954 agreement.

UNKRA urges that had there been such disclosure, it would have been evident that Simplex in fact was liable under the June 1954 agreement, both by

---

7. Cf. Channel Master Corp. v. Aluminum Limited Sales, Inc., 1958, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833; Deyo v. Hudson, 1919, 225 N.Y. 602, 122 N.E. 635; Adams v. Gillig, 1910, 199 N.Y. 314, 92 N.E. 670, 32 L.R.A.,N.S., 127.

reason of actual and apparent authority vested in International; that in consequence there would have been no negotiations leading to the January 1955 agreement, but insistence, instead, that Simplex abide by and perform under the June 1954 agreement.

I am satisfied that Simplex, in good faith and without any purpose to mislead UNKRA, disputed its liability. The disclaimer, in large measure, reflected an opinion on legal responsibility as to which there might be reasonable differences.[8]

Moreover, General Coulter was advised at the October 1954 conference of the existence of the agency agreement, but it is clear that he had little interest in its provisions, or in its legal implications. He was very much interested in getting the project off the ground. UNKRA, as the official agency of the United Nations, had committed itself to the Korean Government for the erection of a Simplex designed plant. The project was stalled on the issue of whether Simplex was a party to the June 1954 agreement. Coulter, confronted with this embarrassing situation, was determined to cut through the red tape, and was intent upon getting Simplex to do the design work. He was not interested in a lawsuit which offered only the prospect of further delay and uncertainty of result. Accordingly, when it appeared that Simplex would not participate, General Coulter, to secure its services promptly, directed his staff to negotiate at once with its representatives to avoid further delay and embarrassment. Moreover, even if, as the plaintiff contends, the precise terms of the agency agreement and other pertinent facts had not been fully disclosed at the October 1954 conference, I am satisfied that thereafter, and prior to the execution of the January 1955 agreement, its provisions were made known to UNKRA's legal adviser, who was one of the negotiating team. Simplex's counsel swore that he showed it to the latter, who, in turn, unequivocally testified to the contrary.

However unfortunate this issue of veracity between members of the legal profession, it must be resolved. Considering the purpose of the October 1954 conference, and the fact that reference was there made to an agreement between Simplex and International, it is difficult to believe that during the intensive negotiations which followed when the parties were represented by counsel who were fully sensitive to all legal problems which had been raised by Simplex's denial that it was bound by International's action, that counsel for UNKRA was not interested in ascertaining the precise terms of so vital a document.

Documentary proof gives support to the view that UNKRA's counsel was made aware of the existence of the agency agreement shortly after the October conference. General Coulter prepared a memorandum of the conference, in which he set forth that Simplex and International were working under an agreement. This advice came to UNKRA's legal adviser within a few days after the conference. It taxes credulity to suggest that this notice failed to alert him to the significance of such an agreement. In addition, the legal adviser, in December 1954, after negotiations had been proceeding apace for some time, specifically noted the concern of Simplex's counsel of likely litigation with International "in view of the terms of their contract. (Frazier-Simplex, Inc.—Frazier-Simplex International.)" Under all the circumstances, and based upon observation of the witnesses who testified on this critical issue, I am persuaded that the terms of the agency agreement were known to UNKRA's representatives before the January 1955 agreement was signed. Since plaintiff knew of the terms of the agency agreement, there is no basis upon which to uphold its claim that the January 1955 agreement was induced by any fraudulent conduct on the part of Simplex.

8. See Schumaker v. Mather, 1892, 133 N.Y. 590, 594–595, 30 N.E. 755, 756.

■ We next reach the question of the legal effect of the January 1955 agreement. Under its terms, Simplex was obligated to do the design work as therein provided, and International, which was also a signatory, the construction, procurement and supervision, as provided for under the first agreement. Again the parties differ—this time as to the legal consequences of the agreement. The plaintiff contends that it was an executory accord which did not discharge the liability of either defendant under the June 1954 agreement unless fully performed according to its terms.[9]

In short, plaintiff's position is that since Simplex was liable under the June 1954 agreement on the basis of apparent authority, its obligation thereunder continued, unless it duly performed under the subsequent agreement.[10] The issue of performance so tendered has been reserved for a subsequent trial, but the legal effect of the January 1955 agreement is presented for determination here.

Simplex urges that the January 1955 agreement effected a full release or discharge of its obligations under the June 1954 agreement; that it was a "novation" or "substituted contract," giving rise to entirely new and independent obligations, and that its liability must be tested solely with reference thereto.

Thus, the question posed is whether the January 1955 agreement is a substitute or superseding one which discharged Simplex's obligations under the earlier one,[11] or whether it is an executory accord which did not have that effect.[12]

Citation of legal authority is of little aid here. The issue is essentially one of fact—the intention of the parties—and this must be determined against the background facts and in proper perspective.

Reference has already been made to the fact that the project had bogged down; that General Coulter was determined to cut through red tape; that UNKRA was in an embarrassing situation by reason of its announcement to the Korean Government that the glass plant would be designed by Simplex, "the premier glass plant designers of the world," only to find itself with a contract to which Simplex was not a signatory. What UNKRA wanted so desperately was to get Simplex into the picture, and, in the view of General Coulter, he "was kind of settling the matter."

Almost a month after his original conference, he wrote to Eastwood—"[I]f we can get Frazier-Simplex, Inc. to do what we originally believed was being done, even though a slight cost adjustment is necessary, it would be to our best interests."

The prime objective of UNKRA, to secure the firm commitment of Simplex to do the design and engineering work, was realized when Simplex executed and became a signatory to the January 1955 agreement. UNKRA readily, if not eagerly, accepted this unequivocal and independent obligation in substitution of a legal claim against Simplex based on the 1954 agreement, upon which it might or might not prevail. The new agreement was intended to resolve the dispute which had developed upon Simplex's disclaimer of liability which had halted the project and had placed UNKRA and its officials in a delicate position. The exigencies of the situation into which they had been cast dictated that they obtain Simplex's firm commitment as the designer of the project, even though at a "slight cost adjustment" of $84,500. UNKRA entered into the January 1955 agreement with full knowledge of the agency agreement between Simplex and

9. Restatement, Contracts § 417(c) (1932); 6 Williston, Contracts § 1848 at p. 5207 (revised ed. 1938); N.Y. Personal Property Law, § 33–a.

10. Restatement, Contracts § 417(c) (1932).

11. Cf. Morehouse v. Second Nat. Bank, 1885, 98 N.Y. 503.

12. Larscy v. T. Hogan & Sons, Inc., 1925, 239 N.Y. 298, 146 N.E. 430.

International. It was also aware that it was in a position to assert a claim that Simplex was liable under the June 1954 agreement but it preferred the absolute commitment of Simplex, and this it succeeded in obtaining. It reserved no rights as against Simplex under the prior agreement.

Under all the circumstances, the Court concludes that the sole agreement which governs the rights of Simplex and UNKRA is that of January 1955, and upon its execution, Simplex was discharged from any obligation under the June 1954 agreement.[13]

▪ There remains for final consideration International's defense that the execution of the January 1955 agreement resulted in a waiver of the causes of action asserted against it in the complaint; also its other affirmative defenses based upon acts of UNKRA after the execution of that agreement.

First, the factual situation vis-a-vis UNKRA and International is substantially different from that presented by the UNKRA-Simplex relationship and does not compel the same legal conclusion as to the effect of the execution of the January 1955 agreement. At or after the October 1954 meeting between Coulter and Simplex representatives, UNKRA became aware of McCandless' duplicitous conduct. It was, as already noted, hard pressed and eager to get Simplex into the picture and its efforts were directed principally toward that objective. When, in January 1955, UNKRA entered into the agreement whereby Simplex would undertake the design work, it had no purpose to release International from its obligation under, or from any liability by reason of International's conduct which had led to,

the June 1954 agreement. This is underscored by the January 1955 agreement (to which International was also a party), which provided:

"Except as hereinabove modified, all the terms and conditions of the Contract dated June 25, 1954 shall remain in force and effect."

The modification was the substitution of Simplex instead of International for the performance of the design work under Title I. International, the signatory to the June 1954 agreement, was held to the remaining Titles II through V, which provided for construction, procurement and supervision of the glass plant, as specified in that agreement. Accordingly, the Court holds that the execution of the January 1955 agreement was neither intended to, nor did it, effect a release of International from its liability based upon its conduct in procuring the execution of the June 1954 agreement—the subject matter of the causes of action asserted against it herein.

However, three separate and independent acts by UNKRA, subsequent to the execution of the January 1955 agreement, are also advanced by International in support of one or more of its affirmative defenses.

On February 16, 1955, UNKRA and International entered into two letter agreements. One acknowledged that they[14] had agreed upon "a settlement under Title I" of the June 1954 contract, with respect to which UNKRA had reserved its right to an accounting when the January 1955 agreement was signed. The other obligated International to return to UNKRA (which it did), $118,715.98 of moneys previously advanced under Title I of the June 1954 agreement. It also provided that International was

13. The plaintiff's reliance upon such cases as Moers v. Moers, 1920, 229 N.Y. 294, 128 N.E. 202, 14 A.L.R. 225; American Textile Machinery Corp. v. United States, 6 Cir., 1955, 220 F.2d 584; Goldbard v. Empire State Mut. Life Ins. Co., 1st Dep't. 1958, 5 A.D.2d 230, 171 N.Y.S.2d 194, for the general proposition that it is assumed one does not surrender an existing obligation for a promise to perform in the future, is misplaced. In the cases cited the original obligation of the promisor was clear and unchallenged, a factual situation which does not exist in the instant case.

14. (Also Frazier-Simplex Korea, Inc., assignee of International.)

relieved of its obligation "under Title I of the Contract dated June 25, 1954," and further that except as so modified, all the terms and conditions of the January 10, 1955 contract continued in full force and effect. There was no other reservation.

In end result, the parties reaffirmed their agreement of January 10, 1955 that International was to perform Titles II, III, IV and V of the original agreement. International, while "relieved" of any obligation under Title I, was clearly recognized as the principal for the performance of the construction, procurement and supervision.

The February 1955 letter agreements were concluded after two weeks of negotiations between plaintiff's legal adviser and other officers and International's attorney and representatives. The Court has already found that UNKRA's legal adviser had knowledge prior to the signing of the January 1955 agreement of the terms of the agency relationship between Simplex and International. It further finds that the same intelligence was conveyed to UNKRA's legal adviser, this time by International's counsel during the negotiations, which preceded and resulted in the agreements of February 16, 1955, to which only UNKRA and International and its assignee were parties. And, of course, UNKRA officials also knew at this time that International's conduct had resulted in an increased cost for the design services under Title I to secure the absolute commitment of Simplex. Notwithstanding, UNKRA neither then asserted, nor reserved, any claim against International, based upon any conduct which led to the execution of the June 1954 agreement.

The express acknowledgment that the parties had agreed upon a settlement of Title I of the June 1954 agreement, the absence of reservation of rights with respect thereto, the payment by International to UNKRA, and the latter's acceptance of the $118,715.98, as stipulated, clearly establish a release and accord and satisfaction insofar as any claim under Title I of the June 1954 agreement is concerned.[15]

The agreement of February 1955 was not the only action taken. On May 2, 1955, UNKRA unilaterally terminated, as was its right, Title IV of the existing agreement "for the reason of convenience and being in the best interest of UNKRA." In so doing, it rendered itself liable to International for reimbursable items incurred by the latter prior to the notice. On September 7, 1955, UNKRA similarly terminated the remaining Titles II, III and V, and so ended the contract relationship. In taking these two final steps, UNKRA again failed to assert or reserve any claim against International, based upon conduct in connection with the June 1954 agreement. The conclusion is compelled that UNKRA, having entered into the "settlement" of Title I, and thereafter having terminated for "its own best interest" all remaining titles, with full knowledge on each occasion of all the material facts bearing upon its claims of fraud and breach of warranty, and having failed to reserve or assert any claimed rights with respect thereto, fully waived such claims.[16]

The foregoing shall constitute the Court's findings of fact and conclusions of law.

Judgment may be entered accordingly.

---

15. The issue of performance by International of other obligations set forth in the letter agreement of February 1955, has been deferred for a second trial under a stipulation of the parties.

16. Cf. Grymes v. Sanders, 1876, 93 U.S. 55, 23 L.Ed. 798; Phillips Petroleum Co. v. Rau Const. Co., 8 Cir., 130 F.2d 499, 502, certiorari denied 1942, 317 U.S. 685, 63 S.Ct. 260, 87 L.Ed. 549; Hagenaers v. Caballero, 1st Dep't. 1919, 188 App. Div. 643, 177 N.Y.S. 313; Kelly v. Delaney, 1st Dep't. 1910, 136 App.Div. 604, 121 N.Y.S. 241, affirmed 1912, 205 N.Y. 618, 98 N.E. 1105.