**SONGBIRD JET LTD., INC. and Jet Leasing Corporation, Plaintiffs,**

v.

**AMAX INC., Defendant,**

v.

**Alan P. ROSEFIELDE, William F. Handy and Songbird, Ltd., Counterclaim Defendants.**

No. 83 Civ. 585.

United States District Court, S.D. New York.

Feb. 21, 1984.

**914**

Lord, Day & Lord, New York City, for plaintiffs and counterclaim defendants; Stephen M. Hudspeth, Darrell E. Prescott, Jonathan M. Jacobson, New York City, of counsel.

Sullivan & Cromwell, New York City, for defendant; John L. Warden, Jeffrey S. Parker, John L. Hardiman, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiffs, Songbird Jet Ltd., Inc. ("Songbird Jet") and Jet Leasing Corporation ("Jet Leasing"), brought this diversity action against the defendant, Amax Inc. ("Amax"), alleging breach of a sales contract, breach of a brokerage contract, fraud based upon defendant's lack of intention to perform the agreements, and unjust enrichment in connection with an alleged purchase by them from defendant of a Falcon Jet, Model 50, Serial No. 108 ("the 108").

Amax denies the alleged agreements and plaintiffs' other claims and alleges that sale of the 108 was an inseparable part of an entire transaction that included the purchase of another Amax jet, the leasing by plaintiffs to the defendant of a third jet and the cancellation of an outstanding lease on still another jet. Based upon this alleged transaction, Amax asserts counterclaims against the plaintiffs and their principals and chief executive officers, Alan P. Rosefielde ("Rosefielde") and William F. Handy ("Handy"), who are named as counterclaim defendants (collectively referred to herein as "the plaintiffs").

The defendant now moves pursuant to Fed.R.Civ.P. 56 for summary judgment dismissing plaintiffs' claims. The defendant filed a statement pursuant to Local Civil Rule 3(g), many allegations of which are challenged by plaintiffs, who contend that controverted material fact issues require a trial. Both parties in support of and opposition to the motion have submitted affidavits, depositions, answers to interrogatories, and documents obtained during extensive pretrial discovery.

## THE PARTIES

### A. THE PLAINTIFFS AND THEIR PRINCIPALS AND EXECUTIVE OFFICERS.

Songbird Jet has been engaged in the business of buying, selling, leasing and brokering business jet aircraft and is controlled by Rosefielde. He is a former tax lawyer who in addition to other duties handles financial and legal matters for plaintiffs. A not uncommon feature of some of the transactions engaged in by plaintiffs, whether they involved a purchase, sale or lease of an airplane, was a tax benefit transfer, sometimes referred to as a TBT, to one of the participants.

Jet Leasing, controlled by Handy, a former airline pilot and aircraft manufacturing employee, is primarily engaged in the business of brokering, managing, maintaining and operating business jet aircraft. Jet Leasing also provides technical services, such as testing and demonstrating corpo-

rate jets or checking on and facilitating production of an aircraft at a manufacturer's plant. It is alleged that the two plaintiff corporations under the direction of their respective principals, Rosefielde and Handy, acted as a single, unified entity.

### B. THE DEFENDANT AND ITS EXECUTIVE OFFICERS WHO PARTICIPATED IN THE TRANSACTIONS.

Amax, the defendant, is a publicly held corporation organized under New York law with its principal place of business in Greenwich, Connecticut. It is engaged in the business of exploration for and extraction, refinement, and treatment of minerals, metals, coal, oil and natural gas. It owns or leases several business jet aircraft to transport its corporate personnel. In the spring of 1982, due to severe financial losses, Amax embarked on an austerity program and decided to reduce its corporate jet fleet. At that time it owned and used two Falcon Model 50 corporate jets, serial numbers 8 and 69 (the "8" and "69," respectively) and was the lessee from plaintiffs of a Falcon Model 20F, Serial No. 388 (the "388"). Amax also was the owner of the 108, which then was under construction by the Falcon Jet Corporation, and had not been delivered to Amax. It is this 108 jet that is the subject of plaintiffs' claims.

David Ayres, Manager, Financing ("Ayres"), Edward Miller, Senior Vice President, Administration ("Miller"), and Jack Esposito, Manager, Flight Operations ("Esposito") were assigned to put into effect the policy of reducing Amax's corporate jet fleet.

### PLAINTIFFS' VERSION OF EVENTS

Plaintiffs' claims originate in events and meetings commencing in June of 1982 relating to Amax's fleet reduction program. On June 15 Handy and Rosefielde met with Miller, Ayres and Esposito to discuss the disposition of one or more of Amax's corporate jets. Plaintiffs claim that at this meeting the participants agreed that plaintiffs would "broker" the 108 jet for "about" $9 million; that in exchange for their services in locating a purchaser for the aircraft, they would receive the profit that plaintiffs could arrange by means of a purchase and resale of the aircraft.

Plaintiffs further allege that in September of 1982 they located L.R. French, Jr. ("French"), a Texas oil man who agreed to purchase the 108, but who had no need for any tax benefit transfer that might be available. In addition to his lack of interest in any tax benefit, French wanted a Lear jet that he owned accepted as a trade-in to reduce the price. Rosefielde testified that on October 8 he informed Ayres of the French offer and advised him that, since French had no interest in the tax benefits, Amax could realize additional revenues by selling them to a third party, with a consequent reduction in price to French, provided that the 108 was in service before January 1983. However, the proposal for the trade-in of the Lear was not acceptable to Ayres. Rosefielde further testified that to consummate the transaction he proposed that Songbird Jet purchase the 108 and in turn sell it to French, and that Songbird Jet would accept the Lear in a trade-in, using the proceeds from its sale towards plaintiffs' purchase price so that in end result Amax would net approximately $9 million. According to Rosefielde, Ayres stated the proposal was acceptable to him and that "he would run it up the flag pole," which each understood to mean approval by Ayres' executive seniors. Sometime thereafter, about October 28, Ayres advised Rosefielde that senior management had approved and that the parties had a deal for the sale to plaintiffs of the 108 for $8,850,-000 net (reduced from $9,000,000 by the cost of making modifications in the plane as requested by French). Rosefielde testified that Ayres, on behalf of the defendant, agreed to sell the plaintiffs the 108 if (1) Amax were provided with a $250,000 deposit to be applied toward the purchase price of the plane, and (2) it was presented with a copy of the agreement between plaintiffs and French with terms acceptable to Amax.

Rosefielde, according to his testimony, on the following day met with Ayres, who

confirmed the foregoing arrangement. On that occasion Ayres was given an unsigned copy of the agreement between French and Songbird for Amax's approval, which Ayres said was satisfactory, and soon thereafter plaintiffs provided Ayres with a copy of the French-Songbird agreement signed by French. Meanwhile, John Kennedy, Jet Leasing's controller, on instructions from Rosefielde, forwarded the $250,-000 check and subsequently, as hereafter described, two substituted checks for the same amount. The first draft of a proposed Amax-Songbird Jet agreement prepared by Amax's attorneys was returned, Rosefielde testified, because it did not mirror the Songbird Jet-French agreement. Thereafter, between mid-November and early December 1982, other drafts prepared by Amax's attorneys were submitted to plaintiffs, although none was signed by either plaintiffs or defendant. Plaintiffs assert other conduct, in addition to the retention of the $250,000 by Amax, as evidencing an executed contract for the sale of the 108 to them. Plaintiffs claim that during November and December of 1982 Jet Leasing representatives went to the AiResearch facility in Los Angeles where the 108 was then under construction to expedite its completion and delivery by the end of the calendar year 1982, a requisite if the defendant were to realize a sale of the tax benefits to a third party.

Plaintiffs contend that the foregoing events constitute and confirm a binding contract between the parties and that the reduction of the agreement to written form was to memorialize its terms—it was merely to "mirror" the terms of the agreement between French and Songbird Jet, an executed copy of which, dated November 4, 1982, was transmitted to Ayres by letter dated December 13, 1982.

Plaintiffs assert that Amax breached the agreement on December 22, 1982, when Ayres notified plaintiffs the 108 was not for sale and disputed that a contract had been entered into. Amax, on December 29, 1982, sold the tax benefits to a third party. On January 19, 1983, plaintiffs instituted this action, asserting the following claims against Amax:

(1) fraudulent misrepresentation of its intention to sell the 108;

(2) breach of an agreement by Amax to sell to plaintiffs the 108 for resale by them to French (the "sales contract");

(3) breach of a separate, but related, agreement appointing plaintiffs as broker in connection with the sale of the 108 (the "brokerage contract"); and

(4) unjust enrichment arising from defendant's retaining the various benefits derived from plaintiffs' activities, including advice by Rosefielde as to tax benefits.

### THE DEFENDANT'S VERSION OF EVENTS

Needless to say, the defendant's version of events as to what transpired at the various meetings beginning in June of 1982 differs from that of plaintiffs. While Amax admits that the parties were engaged in negotiations with respect to the various jets, it denies an enforceable agreement was ever reached either for the sale or the brokerage of the 108. As to the June 15 meeting, Amax denies that it offered to sell the 108 for "about" $9 million. Rather, it contends that Rosefielde and Handy offered on behalf of plaintiffs:

(1) to buy the 108 for $9.4 million;

(2) to buy the 8 for $7.5 million;

(3) to lease to Amax a Falcon model 50, serial number 87, jet, owned by plaintiffs, for two years at a rental of $130,000 per month; and

(4) to accept cancellation of the existing lease of the 388.

Amax contends that these transactions constituted a non-severable "package" deal which was duly accepted by its board of directors on July 1, 1982, when the following resolution ("the July resolution") was passed:

[T]he officers of the Company ... hereby are authorized to enter into an agreement or agreements with Jet Leasing

Corporation ("JLC") whereby (i) JLC will purchase the Company's Falcon 50 # 8 aircraft for a total consideration of $7,500,000, (ii) JLC will purchase the Company's Falcon 50 # 108 aircraft scheduled for delivery in December 1982 for a total consideration of $9,400,000, (iii) the Company will lease from JLC a Falcon 50 # 87 aircraft for a period of 24 months at $130,000 per month, effective in the Spring of 1982, and (iv) the agreement currently in effect between the Company and JLC covering the lease of a Falcon 20 aircraft will be cancelled effective September 15, 1982.

Subsequently, on August 11, 16, and at other times in the summer of 1982, Amax asserts that it received "offers" from plaintiffs to purchase one or both of the two Falcon 50 jets that were part of the package deal "far below" and "entirely different" from what had been agreed upon, as set forth in the above authorization. In addition, Amax learned that plaintiffs had sold the 87, the plane that was to be leased to it under the "package deal," to a third party. Amax deemed these actions to have constituted a repudiation of the authorized package agreement. It nevertheless appears that thereafter the parties were engaged in discussions with respect to the sale and leasing of Amax's corporate jets. However, during this period Amax was in touch with other brokers in efforts to dispose of one or more of its jets, including the 108.

With respect to the events of October 1982 relating to the transaction involving French, which plaintiffs allege resulted in an agreement for the sale to them of the 108, Amax, while not disputing that there were negotiations, denies any agreement was reached, and moreover, asserts it was the parties' intention not to be bound unless written agreements were executed by them. Amax contends that the $250,000 was a deposit to induce it to take the plane off the market and not to entertain any other offers on the plane from third parties while plaintiffs carried on their negotiations with French and simultaneously negotiated with Amax. To support these contentions, Amax relies on, among other matters, a letter from John Kennedy, controller of Jet Leasing, accompanying the $250,000 check, which stated:

> Said deposit will be immediately refunded to Jet Leasing Corporation in the event, for any reason, that Jet Leasing Corporation would request in writing said deposit refunded.

> Should Jet Leasing Corporation not request refund before final agreement on said aircraft, and should agreement be finalized on said aircraft between Jet Leasing Corporation and Amax Inc., and at the sole discretion of Jet Leasing Corporation said purchase deposit will be credited towards final aircraft purchase price or refunded to Jet Leasing Corporation.

Amax stresses that the letter by its very terms indicates lack of agreement. Amax also emphasizes that despite the submission of the three separate drafts of proposed agreements with plaintiffs, none was ever signed by either Amax or plaintiffs. Amax further contends that any activities by plaintiffs at the AiResearch facility were in their own interests, wholly voluntary, and part and parcel of their efforts to consummate a contract with French. After plaintiffs were advised on December 22, 1982 that the offer was not satisfactory, the defendant, on January 3, 1983, returned the $250,000 deposit, less $53,789.68, which Amax claimed was owed to it by plaintiffs, a claim the latter denied.[1]

Entirely apart from the factual challenge to plaintiffs' claims, Amax sets up legal defenses that it contends bar recovery by plaintiffs. First, it contends that plaintiffs' sales contract claim is barred by the applicable Statute of Frauds, U.C.C. § 2-201, since the alleged agreement is not evidenced by any signed writings by Amax,[2]

---

1. Plaintiffs originally claimed that the retention of the $53,789.68 constituted conversion of plaintiffs' funds and a breach of contract. By consent order, these claims have been settled.

2. N.Y.U.C.C. § 2-201 (McKinney's 1964).

and that since the alleged brokerage agreement has no legal significance apart from the alleged sales agreement, it, too, is barred. Next, Amax contends that neither Ayres nor Miller had authority to enter into an agreement to sell the 108 without express approval of the board of directors or its executive committee.[3]

In resisting these legal defenses, plaintiffs contend that the requirements of § 2–201 have been met in that (1) Amax has admitted the validity of the alleged contract; (2) there is ample evidence of writings sufficient to meet the requirements of the applicable statute, § 2–201 of the Uniform Commercial Code; and (3) the contract was partially performed.

With respect to the defense of lack of authority, plaintiffs rely upon the July resolution, as well as on other documents and testimony.[4] In addition, they contend that, based on a past course of dealings, they were led to believe that Ayres and Miller had apparent authority and "were held out" as having the requisite authority to bind Amax to the sale of the 108, which contention, in turn, is disputed by Amax.

Against that general background of the disputed factual and legal contentions, we consider each separately.

## DISCUSSION

As recently stated by our Court of Appeals, under the standard for granting summary judgment:

> [t]he moving party has the burden of demonstrating the absence of any material factual issue genuinely in dispute .... To defeat a summary judgment motion, the opposing party must set forth "supporting arguments or facts in opposition to the motion."[5]

The Court also noted that a District Court should " 'resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought' ";[6] or, as sometimes otherwise stated, where "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact,"[7] the motion must be denied. The Court has repeatedly emphasized that " 'on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried.' "[8]

It is desirable first to address the defendant's claim that Ayres and Miller had neither express, implied nor apparent authority, as defined under New York law,[9] to enter into the alleged agreement since if Amax prevails thereon, it is unnecessary to reach other issues except the claim of unjust enrichment.

As to express authority, the July resolution authorizes the officers of the company to enter into "an agreement or agreements" with respect to four jets, including one for the sale by defendant to plaintiffs of the "108 aircraft scheduled for delivery in December 1982 for a total consideration of $9,400,000."[10] While it is true that the resolution grants authorization for transactions with plaintiffs as to three other jets, there is nothing in the resolution itself which indicates, as defendant contends, that the parties contemplated a single non-severable or "all-or-nothing" deal. Indeed, the authorization to enter into an "agree-

---

3. See Doc. No. 02475–02480 (Amax Controller's Manual).

4. See, e.g., Plaintiffs' Exhbt. 84 (discretionary authority of Amax personnel to invest company funds).

5. Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9 (2d Cir.1983).

6. Beacon Enters. Inc. v. Menzies, 715 F.2d 757, 762 (2d Cir.1983) (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975)).

7. Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9 (2d Cir.1983).

8. Id. (quoting Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir.1975)).

9. The parties do not dispute that in this diversity action New York's substantive law applies.

10. Plaintiffs' Exhbt. 38.

ment or agreements," with respect to each particularly described jet, may reasonably be construed, as plaintiffs here contend, that there was authorization for a separate transaction as to each jet.

While there is a variance between plaintiffs' claim that the sale price for the 108 jet was "about" $9,000,000 and the $9,400,000 specified in the July resolution, plaintiffs contend that past dealings and events concurrent with and subsequent to the passage of the resolution would permit a reasonable inference that either implied or apparent authority were vested in Ayres and Miller to negotiate a sale at a lesser amount. "Implied authority" has been considered by most authorities to be actual authority given implicitly by the principal to his agent.[11] "Implied authority" has also been defined as "a kind of authority arising from the designation by the principal of a kind of agent who ordinarily possesses certain powers."[12]

■ "Apparent authority is based on the principle of estoppel. It arises when a principal places an agent in a position where it appears that the agent has certain powers which he may or may not possess. If a third person holds the reasonable belief that the agent was acting within the scope of his authority and changes his position in reliance on the agent's act, the principal is estopped to deny that the agent's act was not authorized."[13] Finally, where one seeks to hold one liable as a principal it is not required he specify which type of authority he relies upon, "general proof of agency being sufficient."[14]

First, to establish implied authority, plaintiffs argue that the amount involved in each authorized transaction as specified in the July resolution ran into the many millions of dollars—in the instance of the 108 in excess of $9,000,000—and that the board did not freeze those amounts, but permitted Ayres and Miller, the corporate executives whose duties admittedly included entertaining and negotiating offers to purchase, sell or lease aircraft,[15] to conclude such a transaction by a reasonable price adjustment, a not uncommon situation, plaintiffs assert, in the sale or lease of jets involving such amounts. Plaintiffs have offered deposition testimony concerning the free-wheeling nature of sales negotiations in the aircraft industry which may give support to this contention.[16] Plaintiffs also rely upon a corporate directive that had been interpreted by Amax's officials to authorize the consummation of sales as long as the contract price was within 10 percent of that approved by the board.[17] The application of this directive in the instant case would have authorized Amax's officers to accept a price of $8,460,000 for the 108 without returning to the board for approval.

In addition, there is evidence that in transactions previously engaged in by the parties in November 1981, involving two Falcon jets of the model that was a subject of the July resolution, authority for such an adjustment was recognized. In the 1981 transactions, which the parties refer to as a "swap" or exchange of contracts for the purchase of jets, Amax's corporate resolution for the price of the 69 jet, which it acquired from a plaintiff affiliate, authorized the acquisition at "approximately $14,-

---

**11.** "[M]ost authorities consider 'implied authority' to be merely a sub-group of actual authority." *Lind v. Schenley,* 278 F.2d 79, 84 (3rd Cir.1960) (*citing* Mechem, Agency §§ 51–60 (4th ed. 1952)); *see also Masuda v. Kawasaki Dockyard Co.,* 328 F.2d 662, 664–65 (2d Cir.1964).

**12.** *Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 85 (3rd Cir.1960), *quoted in Masuda v. Kawasaki Dockyard Co.,* 328 F.2d 662, 664–65 (2d Cir. 1964).

**13.** *Masuda v. Kawasaki Dockyard Co.,* 328 F.2d 662, 665 (2d Cir.1964); *see General Overseas*

*Films, Ltd. v. Robin Int'l, Inc.,* 542 F.Supp. 684, 688–89 (S.D.N.Y.1982).

**14.** *Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 85 (3rd Cir.1960).

**15.** *See, e.g.,* Plaintiffs' Exhbt. 88 (Ayres' job description).

**16.** *See* Rosefielde Deposition at 65–69.

**17.** Plaintiffs' Exhbt. 84.

000,000 (subject to adjustment of interest charges)." A draft of this resolution was sent to Rosefielde.

In applying the doctrine of implied authority, New York State follows the general rule that "an agent employed to do an act is deemed to do it in the manner in which the business entrusted to him is usually done." [18] Given the nature of the transaction, the prior relationship between the parties and other objective factors, it cannot be ruled out as a matter of law that a fact finder may reasonably conclude upon the totality of evidence that Ayres, who, as already noted, was expressly empowered to negotiate the disposition of Amax jets in furtherance of its cutback policy, also had the authority to adjust the sales price of the 108 to "about" $9,000,000, notwithstanding the July 1, 1982 resolution's stipulated price of $9,400,000 and to bind Amax to such a sale. On the other hand, a fact finder may determine that Ayres' authority was limited to, and did not extend beyond, negotiating offers to be submitted for final board approval.

To sustain its position that Ayres had apparent authority, plaintiffs point to the undisputed fact that Ayres, Miller and others were especially designated to negotiate the disposition of Amax's jets in furtherance of the austerity program and that following the June 1982 meeting when offers submitted by plaintiffs were not acceptable to Amax, negotiations continued through the months that followed and eventuated in the French transaction and the receipt by Amax of $250,000. In the light of the prior dealings of the parties, the continued negotiations by plaintiffs with Ayres, after several offers had been rejected, were not extraordinary and a fact finder could, upon the totality of the history of the parties' relationship with respect to the sales, purchase or lease of jets, conclude that Ayres had apparent authority to consummate the sale of the 108.

The issue of authority in this case bristles with disputed fact questions. "Questions of agency and of its nature and scope and of ratification by or estoppel of the principal, if dependent upon contradictory evidence or evidence, though not contradictory or disputed, from which different inferences reasonably may be drawn, are questions of fact to be submitted to the jury upon proper instructions by the court." [19] The Court finds there is a genuine issue to be tried concerning the authority of Amax employees to bind the company to the terms alleged.

The defendant next argues that even if Ayres and Miller possessed the requisite authority, there was no mutual assent to a contract and that plaintiffs' own actions negate the existence of the alleged contract for the sale of the 108. Amax, apart from its basic contention that the parties were engaged only in negotiations that never resulted in a final binding agreement, relies heavily, and with good cause, upon the letter that accompanied the plaintiffs' $250,000 check payable to one of the Amax companies. Amax contends that the dispute as to the purpose of the check is irrelevant since the letter not only specifies that it was "refundable" upon plaintiffs' demand, but further states that "should an agreement be finalized ... said deposit will be credited toward the purchase price." Thus, Amax contends that plaintiffs themselves clearly understood that no agreement had been reached to sell the 108 and that the plane was still the subject of negotiations with a written contract to be executed if, in fact, the parties reached agreement. There can be no doubt that this is a substantial contention—but it cannot be separated from the basic dispute as to the purpose of the $250,000 payment. Rosefielde contends that the sum was a deposit to be applied toward the purchase price upon the consummation of plaintiffs' agree-

**18.** *Wen Kroy Realty Co. v. Public Nat'l Bank & Trust Co.,* 260 N.Y. 84, 90, 183 N.E. 73, 74 (1932) (citation omitted), *quoted in Masuda v. Kawasaki Dockyard Co.,* 328 F.2d 662, 665 (2d Cir. 1964).

**19.** *Hedeman v. Fairbanks, Morse & Co.,* 286 N.Y. 240, 248–49, 36 N.E.2d 129, 133 (1941).

ment with French, whereas Ayres testified he requested and received the deposit as a demonstration of plaintiffs' good faith interest in the purchase of the 108 and as consideration for Amax to withdraw the plane from the market pending completion of negotiations.

 Considered together with the acts of the parties and attendant circumstances, the letter does not conclusively establish lack of mutuality of obligation. The words "finalize" and "final aircraft purchase price," which the defendant describes as "futuristic" and "tentative" are, in the light of contemporaneous events, including Amax's retention of the check after it notified plaintiffs that their offer was not acceptable, open to conflicting interpretations. "[U]ntangl[ing] this Gordian knot"[20] is not the Court's function on this motion. Its function is to decide whether or not a genuine issue of fact exists. Moreover, that the parties have not executed a formal document embodying their agreement[21] does not preclude the existence of a contract. The issue is the intent of the parties, revealed by their objective manifestations, taking into account the totality of the attendant circumstances.[22] Recently on this very subject, our Court of Appeals noted the New York rule:

> First, if the parties intend not to be bound until they have executed a formal document embodying their agreement, they will not be bound until then; and second, the mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event.... These rules placing the em-

phasis on intention rather than form, are sensible and reasonable.

. . . .

Thus, the primary question ... is one of intent. *Banking & Trading Corp. v. Floete*, 257 F.2d 765, 769 (2d Cir.1958). Did the parties intend not to be bound prior to execution of a formal contract? Or, did they merely contemplate that their formal agreement would be reduced to a formal writing at some later time?[23]

 The answer to this primary question of intent is to be determined by the fact finder and not by the Court on this motion for summary judgment.

We next turn to Amax's further contention that even assuming the parties reached an agreement to be memorialized at a later time, nonetheless any claim thereunder is barred by § 2–201 of the Uniform Commercial Code, which, in pertinent part, provides:

> [A] contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker."[24]

 As the previous discussion demonstrates, there is no single writing signed by Amax explicitly acknowledging the sale of the 108 on the terms alleged by plaintiffs. Plaintiffs seek to overcome the Statute of Frauds defense, first by a claim that Amax has admitted in its counterclaim the contract upon which plaintiffs sue. It relies upon § 2–201(3)(b) of the U.C.C., which permits the enforcement of oral contracts where "the party against whom enforce-

---

**20.** *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 9 (2d Cir.1983).

**21.** *V'Soske v. Barwick,* 404 F.2d 495, 499 (2d Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); *see Investment Serv. Co. v. Roper,* 588 F.2d 764 (9th Cir.1978); *Oskey Gasoline & Oil Co. v. Continental Oil Co.,* 534 F.2d 1281 (8th Cir.1976); *Municipal Consultants & Publishers, Inc. v. Town of Ramapo,* 47 N.Y.2d 144, 150, 390 N.E.2d 1143, 1144–45, 417 N.Y.S.2d 218, 220 (1979).

**22.** *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.,* 41 N.Y.2d 397, 399–400, 361 N.E.2d 999, 1001, 393 N.Y.S.2d 350, 352 (1977).

**23.** *Reprosystem, B.V. v. SCM Corp.,* 727 F.2d 257 (2d Cir.1984) (*quoting V'Soske v. Barwick,* 404 F.2d 495, 499 (2d Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969)).

**24.** N.Y.U.C.C. § 2–201 (McKinney's 1964).

ment is sought admits in his pleading ... that a contract for sale was made." Specifically, plaintiffs assert that Amax has admitted in its counterclaim that it had a contract with plaintiffs to sell the 108, that plaintiffs and counterclaim defendants made an offer in June of 1982 to purchase the 108 for $9.4 million and Amax's board by the corporate resolution which authorized the transactions as to the four jets, including the 108, accepted this offer on July 1, 1982. However, this is a misreading, even a distortion, of the allegations of the counterclaim. The defendant's pleading alleges that the July 1, 1982 corporate resolution was an "all-or-nothing" transaction, as previously referred to; it cannot be fairly described as an admission as claimed by plaintiffs. As already noted, whether the resolution authorized separate transactions as to the jets, or a package deal, is a disputed issue.[25] The counterclaim in no respect admits that a contract was made solely for the sale of the 108.

■■■ Next, plaintiffs claim that a series of documents considered together avoids the statutory ban. They rely on the July resolution, a memorandum by Amax executive R. Bern Crowl written October 27, 1982, requesting that the Amax board "ratify" a contract on the terms specified by plaintiffs, the sales contract between Songbird Jet and French, and various draft agreements between Amax and plaintiffs.[26] However, not one of these documents on its face meets the statute's requirement that there be a document "sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought."[27] There is no such document and in its absence parol evidence interpreting those relied upon by plaintiffs may not be considered.[28]

■■■ Plaintiffs, however, are on firmer ground with respect to their contention that the $250,000 check received by defendant was partial performance of the alleged contract—another disputed fact issue. While we do not pass upon its verity, there is sufficient objective evidence to give support to plaintiffs' claim. Apart from matters already referred to, Kennedy testified that when Ayres requested on separate occasions that the payee of the $250,000 check be changed, Ayres notified him that unless the check was sent immediately, the deal was off. The final check was endorsed and its proceeds retained by Amax for more than two months, and, indeed, not returned until almost two weeks after Amax notified plaintiffs that there was no agreement.

Amax next contends that even if the $250,000 be deemed a partial payment on account of the purchase price, plaintiffs' claim is still ·barred by the Statute of Frauds. The plea is unavailing. The statute itself recognizes that where a contract does not otherwise satisfy the Statute of Frauds, nevertheless it is "enforceable with respect to the goods for which payment has been made and accepted."[29] While the

**25.** Although pursuant to Fed.R.Civ.P. 36 "[a]ny matter admitted ... is conclusively established unless the court on motion permits withdrawal or amendment of the admission," it would pervert the concept of an admission to hold, as plaintiffs urge, that reliance on a document for a limited purpose necessarily admits any reasonable interpretation of that document.

**26.** Plaintiffs also rely on Amax's counterclaim, which has been addressed *supra*. Had pleadings been intended by the Legislature to suffice as a writing for purposes of the statute of frauds, there would be no logical reason for a separate provision governing the circumstances under which an admission in a pleading could excuse a failure to comply with the writing requirement of U.C.C. § 2–201.

**27.** N.Y.U.C.C. § 2–201 (McKinney's 1964). At least one document, on its own, must establish "a contractual relationship between the parties, ... [and] bear the signature of the party to be charged." *Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 56, 110 N.E.2d 551, 554 (1953).

**28.** *See Crabtree v. Elizabeth Arden Sales Corp.*, 305 N.Y. 48, 56, 110 N.E.2d 551, 554 (1953); *see also R.S. Bennett & Co. v. Economy Mechanical Indus.*, 606 F.2d 182, 186 n. 6 (7th Cir.1979) (same).

**29.** N.Y.U.C.C. § 2–201(3)(c) (McKinney's 1964).

$250,000 is far below the $8,850,000, which plaintiffs allege was the contract price, the disparity is not fatal to plaintiffs' position. Apart from plaintiffs' contention that the payment of the balance was foreclosed by Amax's position in December 1982 that no contract was in existence between the parties, "[t]he effect of the part payment on a contract for sale of an indivisible item is not specifically treated by the Uniform Commercial Code, but the weight of authority is clearly to the effect that such payment will render an indivisible oral contract enforceable, notwithstanding the Statute of Frauds." [30] Although the point is not raised by the parties, it is noted that under New York law, when part performance is relied upon to excuse the failure to produce a signed writing, the actions of the party invoking the doctrine, standing alone, must be " 'unintelligible or at least extraordinary[,]' " and " 'unequivocally referable' " [31] to the alleged oral agreement. A payment of $250,000 by itself would be, to say the least, extraordinary and unintelligible in the absence of an explanation, which plaintiffs contend must be [32] that the payment was on an account for the purchase price for the 108—a claim defendant disputes with its contention that it was a good faith deposit to induce it to take the plane off the market pending further negotiations—a disputed issue that requires a trial on the merits of plaintiffs' claim for breach of the sales contract. [33]

We next consider the defendant's motion to dismiss the other claims advanced by plaintiffs. As the foregoing discussion demonstrates, the gravamen of plaintiffs' claim, however variously stated, is the breach of the sales agreement allegedly entered into on October 28, 1982. Plaintiffs, however, have fragmented this claim and allege separately breach of a "brokerage" agreement entered into when, at the meeting of June 15, 1982, plaintiffs were asked to act as a broker in locating a purchaser for the 108 and they agreed to do so. The evidence repels this separate claim of breach of a brokerage contract. Clearly it is an end run to circumvent the Statute of Frauds in the event that statute bars recovery upon the basic breach of contract claim. [34]

The brokerage claim meets an immediate challenge from the July resolution relied upon in part by plaintiffs to sustain their claim for breach of the sales contract. That resolution neither explicitly nor implicitly engaged the plaintiffs to broker the jet fleet or any part of it. To the contrary, it expressly authorized an agreement or agreements whereby the plaintiffs were to purchase two jets, including the 108, and to lease a third to Amax at specified prices, and to cancel an existing lease on a fourth

**30.** *Thomaier v. Hoffman Chevrolet, Inc.,* 64 A.D.2d 492, 495–96, 410 N.Y.S.2d 645, 648–49 (1978); *see Starr v. Freeport Dodge, Inc.,* 54 Misc.2d 271, 274, 282 N.Y.S.2d 58, 61 (Dist.Ct. 1967); *Cohn v. Fisher,* 118 N.J.Super. 286, 296–97, 287 A.2d 222, 227–28 (Law Div.1972).

**31.** *Anostario v. Vicinanzo,* 59 N.Y.2d 662, 664, 450 N.E.2d 215, 216, 463 N.Y.S.2d 409, 410 (1983) (mem.) (*quoting Burns v. McCormick,* 233 N.Y. 230, 232, 135 N.E. 273, 273 (1922)); *see Acuri v. Figliolli,* 91 Misc.2d 831, 834, 398 N.Y. S.2d 923, 926 (Dist.Ct.1977) (applying rule in *Burns v. McCormick* to contract within scope of U.C.C.).

**32.** *See Anostario v. Vicinanzo,* 59 N.Y.2d 662, 664, 450 N.E.2d 215, 216, 463 N.Y.S.2d 409, 410 (1983) (mem.).

**33.** *See Miller v. Schweickart,* 413 F.Supp. 1062, 1066 (S.D.N.Y.1976) (standards on motion for summary judgment); *Club Chain of Manhattan,*

*Ltd. v. Christopher & Seventh Gourmet Ltd.,* 74 A.D.2d 277, 283, 427 N.Y.S.2d 627, 630 (1980) (denying summary judgment because of dispute on question of "unequivocal referability").

**34.** Plaintiffs' purpose in asserting the "brokerage" theory is obvious—if the "brokerage" contract is classified as an agreement to provide services instead of a "transaction in goods," N.Y. U.C.C. § 2–102 (McKinney's 1964), plaintiffs need contend only with the general Statute of Frauds, N.Y.Gen.Obligations Law § 5–701 (McKinney's 1978). Under that statute the alleged oral "brokerage" contract assertedly would be enforceable since it was capable of being performed within a year. *See North Shore Bottling Co., Inc. v. C. Schmidt & Sons, Inc.,* 22 N.Y.2d 171, 239 N.E.2d 189, 292 N.Y. S.2d 86 (1968).

jet. The proposals submitted to plaintiffs thereafter from others to purchase the planes, which were unacceptable to Amax, were in pursuit of plaintiffs' own interests with respect to the planes that were the subject of the July resolution. The evidence is abundantly clear that if the parties contemplated any sale of the 108 it was a sale directly to plaintiffs. The fact that Amax knew that the plaintiffs planned to sell the plane to French is of no significance. The record establishes, and plaintiffs do not contend otherwise, that under the terms of their alleged brokerage agreement the price upon the resale of the plane was a matter to be determined between plaintiffs and French; and that Amax had no control as to the resale price to French and any risk of loss in the resale transaction was that of plaintiffs.[35] Indeed, Rosefielde acknowledged that whether or not the deal with French was consummated, plaintiffs were obligated to Amax under their purchase agreement.[36] To allow plaintiffs' "brokerage" claim to go forward as an independent ground of recovery would remove from coverage by the Uniform Commercial Code virtually all contracts for the sale of goods to middlemen in the chain of distribution, a result that surely was not intended by the Code's framers.[37] Accordingly, Amax's motion to dismiss the so-called brokerage claim is granted.

Plaintiffs assert as a separate fraud count that Amax falsely represented that it intended to sell the 108, and that if plaintiffs located a willing buyer and provided a deposit on the aircraft, defendant would complete the sale; that the defendant's statements were false when they were made; that plaintiffs, in reliance upon such statements (a) incurred substantial expense to locate a purchaser for the 108, (b) entered into a binding contract with that purchaser (French), (c) provided Amax with a deposit against the purchase price, and (d) gave up other opportunities to acquire a comparable business jet within the time period required to take advantage of certain tax benefits and to satisfy the need of that willing purchaser; and that, as a consequence of Amax's conduct, plaintiffs are entitled to out-of-pocket costs, lost profits, and punitive damages. Summed up in their own language, plaintiffs' claim is that "Amax never intended to sell the 108 *at the time the agreement to sell the aircraft was made.*"[38] This claim, of course, centers about defendant's alleged breach of the sales contract but is now dressed in the garb of a fraud count. Essentially, plaintiffs ground this claim on New York decisions that authorize an action for fraud when at the time the defendant entered into a contract he had the undisclosed intention not to perform.[39]

---

**35.** *Buttorff v. United Elec. Laboratories, Inc.,* 459 S.W.2d 581 (Ct.App.Ky.1970), upon which plaintiffs rely, involved an arrangement whereby a seller transferred title to cameras to a middleman who then resold them at a set price determined by the seller; losses from discounting were borne in part by the seller; and the arrangement was exclusive between the seller and middleman over a significant territory, *see id.* at 583. *Buttorff* is thus easily distinguishable from the instant case. *See also Brown v. Lee,* 242 Ark. 122, 412 S.W.2d 273, 274 (1967) (no transfer of title to broker); *Selected Listings Co. v. Humiston,* 135 Vt. 106, 108, 370 A.2d 1297, 1298 (1977) (same).

**36.** *See* Rosefielde Deposition at 122.

**37.** It would distort beyond recognition the exception to coverage under the U.C.C. recognized in *Schenectady Steel Co. v. Bruno Trimpoli Gen. Constr. Co.,* 43 A.D.2d 234, 237, 350 N.Y.S.2d 920, 922, *aff'd on other grounds,* 34 N.Y.2d 939,

316 N.E.2d 875, 359 N.Y.S.2d 560 (1974), to hold that the "services" of a middleman in locating buyers for products he purchases from one higher in the chain of distribution render the contract whereby the middleman obtains title to the goods a contract for the sale of services.

**38.** Plaintiffs' Memorandum at 28–29 (emphasis in original).

**39.** *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,* 4 N.Y.2d 403, 407, 151 N.E.2d 833, 835, 176 N.Y.S.2d 259, 262 (1958); *see Sabo v. Delman,* 3 N.Y.2d 155, 143 N.E.2d 906, 164 N.Y. S.2d 714 (1957); *Adams v. Clark,* 239 N.Y. 403, 146 N.E. 642 (1925); *Deyo v. Hudson,* 225 N.Y. 602, 122 N.E. 635 (1919); *Ritzwoller v. Lurie,* 225 N.Y. 464, 122 N.E. 634 (1919); *Ochs v. Woods,* 221 N.Y. 335, 117 N.E. 305 (1917); *Adams v. Gillig,* 199 N.Y. 314, 92 N.E. 670 (1910); *see also Perma Research Dev. Co. v. Singer Co.,* 410 F.2d 572 (2d Cir.1969).

The essential elements of such a claim are (1) representation of a material existing fact; (2) falsity of the statement; (3) scienter; (4) deception; and (5) injury.[40] Thus, to prevail on their claim of fraud, plaintiffs must at the outset show that when, as plaintiffs contend, on about October 28, 1982, Amax agreed to sell the 108, it had no intention to consummate the transaction. This issue of intent turns on the corporate state of mind, a fact capable of ascertainment.[41] Mere allegations are insufficient; plaintiffs "must allege facts to show that the defendant, at the time the promissory representation was made, never intended to honor or act on [its] statement."[42] To meet this burden, plaintiffs argue in effect that the negotiations beginning in June 1982 between Rosefielde and Ayres, the July resolution, the various drafts of agreements prepared by Amax's attorneys, the request by Amax for $250,-000, whatever its purpose, and all the other activities leading up to December 22, 1982, when Amax announced there was no deal, were part of a charade. Other than Rosefielde's charge that the defendant deliberately misrepresented its intention, there is not one iota of evidentiary fact offered to sustain this essential element.[43]

This is a gossamer claim predicated on Rosefielde's opinion, entirely without evidential support, that despite the corporate policy of reducing Amax's jet fleet, defendant's chief executive still wanted a private jet on call for his personal convenience and that of his family, and that he specifically decided to hold on to the 108 as the newest and the most desirable jet and thus "he in fact never intended to sell the plane."[44] The repeated conferences, negotiations and actions relative to the 108 participated in by Ayres from October 28 on to December 22 negate this theory. The fraud claim is dismissed.

Plaintiffs' final claim, that for unjust enrichment, is predicated upon the activities that form the basis of their claim of breach of the sales agreement. Thus, plaintiffs allege under this count that the services for which they seek compensation consist of, "among other things, locating a buyer for [the 108], entering into a binding contract with that buyer [French] for the purchase of said aircraft, repeatedly meeting and conferring with defendant to inform defendant of the progress of the transaction, and informing defendant of the most advantageous means to structure the transaction."[45] This last item refers to plaintiffs' claim that they initiated and suggested to Amax the TBT transaction, thereby making a sale feasible to French upon his terms and yielding to Amax the price it sought.[46] Plaintiffs include within "among

---

**40.** *Sabo v. Delman,* 3 N.Y.2d 155, 159, 143 N.E.2d 906, 907, 164 N.Y.S.2d 714, 716 (1957); *Reno v. Bull,* 226 N.Y. 546, 550, 124 N.E. 144, 145 (1919); *Deyo v. Hudson,* 225 N.Y. 602, 612, 122 N.E. 635, 638 (1919).

**41.** *See, e.g., United States v. Basic Constr. Co.,* 711 F.2d 570, 573 (4th Cir.) (per curiam) ("corporate intent is shown by the actions and statements of the officers, directors, and employees who are in positions of authority or have apparent authority to make policy for the corporation"), *cert. denied,* —— U.S. ——, 104 S.Ct. 371, 78 L.Ed.2d 330 (1983); *cf. Commissioner v. Culbertson,* 337 U.S. 733, 743 n. 12, 69 S.Ct. 1210, 1215 n. 12, 93 L.Ed. 1659 (1949) (" 'the state of a man's mind is as much a fact as the state of his digestion.' ") (*quoting Edgington v. Fitzmaurice,* 29 L.R.Ch.Div. 459, 483).

**42.** *Roney v. Janis,* 77 A.D.2d 555, 557, 430 N.Y. S.2d 333, 335 (1980) (*citing Adams v. Clark,* 239 N.Y. 403, 146 N.E. 642 (1925)), *aff'd,* 53 N.Y.2d 1025, 425 N.E.2d 872, 442 N.Y.S.2d 484 (1981).

**43.** Plaintiffs attempt to overcome the deficiency of this claim by noting an entry in Ayres' diary apparently made after plaintiffs had been notified in December that Amax denied the existence of a contract. The statement, which reads, "[i]nducements of Amax constitute fraud," is inconclusive in the absence of evidence as to its meaning or the circumstances under which it was made. Plaintiffs have failed to support their reliance on Ayres' bare statement and the Court will not speculate as to its meaning or admissibility upon a trial.

**44.** Plaintiffs' Memorandum at 29–30.

**45.** Complaint at ¶ 44.

**46.** Under the provisions of the Economic Recovery Tax Act of 1981, § 201(a), I.R.C. § 168(f)(8) (West.Supp.1982), as well as prior law, a business, such as Amax, could recoup the value of tax deductions and credits accruing from the use of business equipment even if it had no

other things" their monitoring the 108 at AiResearch while it was under construction by Falcon Jet Corporation to insure that it was in service before January 1, 1983.[47]

The doctrine of unjust enrichment rests upon an equitable principle that a person should not be allowed to enrich himself at the expense of another—it comes into play when an individual is "in possession of money or property which in good conscience and justice he should not retain but deliver to another."[48] An indispensable ingredient of such a claim is that as between the two parties involved there must be an injustice.[49] Thus, to prevail upon this claim plaintiffs must establish (1) that Amax was enriched, and (2) as between Amax and plaintiffs the enrichment was unjust.[50]

Plaintiffs' allegations referred to above and the record on this motion leave no room to doubt that what plaintiffs seek under their claim of unjust enrichment is compensation for their time, efforts and activities expended during the negotiations that they assert and Amax denies resulted in an agreement for the sale of the 108. Those activities are not uncommon and are regularly engaged in by parties endeavoring to reach a mutual accommodation. They are the common grist of negotiations aimed toward consummation of an agreement. In such circumstances, the endeavors by either side, if they fail, do not warrant a claim that one party has been unjustly enriched at the expense of the other. Each side's efforts were for the purpose of advancing its own interests. Here, plaintiffs' negotiation efforts were directed toward concluding a contract with Amax in order to consummate their sale of the 108 to French. The parties were engaged in a normal negotiation process for the purchase and resale of a commodity and no reasonable business executive would expect payment for his own preliminary activities if they failed to achieve their objective. "Every businessman faces the risk that the substantial transaction costs necessary to bring about a mutually beneficial contract will be lost if the negotiations fail to yield a satisfactory agreement."[51] This aspect of plaintiffs' claim does not give rise to a valid contention that Amax was unjustly enriched, or, even, that Amax was enriched at all.

The claim that Rosefielde conceived and urged upon Amax the TBT concept is specious. The idea was neither novel nor original.[52] TBT was a publicized tax saving device known not only to Amax officials but to the jet industry at large. The regulations of the Internal Revenue Service spe-

income (and hence no tax liability) which it could offset by the deduction or credit. A corporation without taxable income accomplished this result by "leasing" equipment it would ordinarily use in the course of business from a corporation that did have taxable income. The lessor corporation would become the "owner" of the equipment for tax purposes and could make use of the tax benefits. The lease payments would be offset by some proportion of the value of the tax benefits to the lessor corporation, leading to denomination of the transaction as a "tax benefit transfer." *See* I Senate Rept. No. 97–494, 97th Cong. 2d Sess. 136–38 (1982), U.S.Code Cong. & Admin.News 1982, p. 781. A flurry of such leasing transactions took place in 1982 as a result of the 1981 changes in the tax code, which greatly liberalized the conditions under which a corporation's use of equipment could be characterized as a "lease" for tax purposes. *See id.*

47. The effect of the liberalized TBT rules enacted in 1981, *see supra* note 46, was substantially reversed by legislation enacted on September 3, 1982, which became effective January 1, 1983. *See* Tax Equity and Fiscal Responsibility Act of 1982, § 209(d)(1)(A), 96 Stat. 477 (1982).

48. *Matarese v. Moore-McCormack Lines, Inc.,* 158 F.2d 631, 634 (2d Cir.1946) (*citing Miller v. Schloss,* 218 N.Y. 400, 407, 113 N.E. 337, 339 (1916)).

49. *Indyk v. Habib Bank Ltd.,* 694 F.2d 54, 57 (2d Cir.1982).

50. *Id.*

51. *Gruen Indus. v. Biller,* 608 F.2d 274, 282 (7th Cir.1979); *see Marcraft Recreation Corp. v. Francis Devlin Co.,* 506 F.Supp. 1081, 1086 (S.D. N.Y.1981).

52. *See Downey v. General Foods Corp.,* 31 N.Y.2d 56, 61, 286 N.E.2d 257, 259, 334 N.Y.S.2d 874, 877 (1972).

cifically provided for the tax benefit transfer for which plaintiffs seek compensation.[53]

The claim for monitoring services to expedite delivery of the plane by the end of the year so that the TBT would be available stands on a somewhat different footing, although defendant contends that plaintiffs hindered rather than expedited completion of the plane. Whatever the merits of the dispute, a reasonable argument can be made that when Jet Leasing employees were dispatched to the AiResearch facility, plaintiffs were of the subjective belief that they then had a contract with Amax to purchase the 108 and if they did not act to speed completion by the end of the year, the TBT opportunity would be lost and with it the profit on the resale to French. Thus, plaintiffs assert they did not provide the monitoring services gratuitously but rather because Ayres expressed concern that the plane would not be put into service by the end of the year,[54] and they believed that they were financially at risk. However, the fact that plaintiffs believed they had a contract with Amax for the 108 and were acting to protect their "investment" in the plane does not justify a finding that, if in fact no contract was in effect between them, Amax was enriched, and unjustly so, by the value of the monitoring services.[55] In view of plaintiffs' position that they had a contract for resale to French, it was in their own interests to take whatever steps were available to them to assure that the 108 was in operation by the end of the year, for if it were not plaintiffs' price arrangement would collapse. Plaintiffs' services were entirely voluntary and were designed to and had the effect of protecting their own interests, and even if they incidentally benefitted Amax,[56] they do not give rise to an equitable claim of unjust enrichment. The claims for unjust enrichment must therefore be dismissed.

In sum, defendant's motion for summary judgment is denied as to plaintiffs' claim for breach of a sales contract; it is granted as to all other claims. Submit order accordingly, returnable within five days from date, and upon at least three days' notice of settlement.

So ordered.

---

**53.** *See* Temp.Treas.Reg. §§ 5c.168(f)(8)–1–8 (1982).

**54.** *See* Rosefielde Deposition at 284.

**55.** *Cf.* S.S. *Silberblatt, Inc. v. East Harlem Pilot Block,* 608 F.2d 28, 37 (2d Cir.1979) ("the 'equity of the transaction must shape the measure of the relief'" (citation omitted)).

**56.** Amax disputes any benefit was derived from plaintiffs' activities. It points out that, as the

July resolution states, Amax was contractually entitled to delivery of the plane from the Falcon Jet Corporation by December 1982. Moreover, plaintiffs themselves contend only that "[a]bsent the efforts of Jet Leasing personnel to accelerate completion of the 108, it is *very likely* that the aircraft would not have been completed by year-end...." Plaintiffs' Memorandum at 16 (emphasis added); *see id.* at 46.