In re Martin BETTMAN and Marlene J. Bettman, Debtors.

William and Louise PERRINE, Plaintiffs,

v.

Martin and Marlene J. BETTMAN, Defendants.

Bankruptcy No. 088–80229–21.
Adv. No. 088–0086–21.

United States Bankruptcy Court,
E.D. New York.

April 14, 1989.

Horwitz & Associates, New York City, by Norman Horwitz, for debtors/defendants.

Kressel, Rothlein & Roth, Massapequa, by Anne Rosenbach, for plaintiffs.

OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

This is a complaint challenging the dischargeability of a debt. The Plaintiffs are William and Louise Perrine ("Perrines"). The Defendants are Martin and Marlene Bettman. The evidence, however, relates exclusively to Martin Bettman. The complaint challenges dischargeability under 11 U.S.C. § 523(a)(2)(A).

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334. This is a core proceeding because it involves a determination as to the dischargeability of a particular debt. 28 U.S.C. § 157(b)(2)(I).

The debt which the complaint asks to have declared nondischargeable was the value on foreclosure of a money market certificate pledged on June 17, 1983 as collateral to the Hempstead Bank (now Norstar Bank), for a loan made to Bettman Nut Enterprises, Inc. ("Bettman Nut"). The gravamen of the complaint is that the plaintiffs were induced to pledge the bank certificate as collateral on the representation that it was required to secure the personal obligation of Martin Bettman and not of any corporate entity, that they relied on assurances that Martin Bettman's personal financial situation was sound; that Martin Bettman knew these representations to be misleading and made them with the intent to deceive the plaintiffs.

The defendants filed a general denial.

The parties stipulated to the following facts:

1. The Plaintiff (sic) did pledge a certificate of deposit as security for a loan made by Norstar Bank (previously Hempstead Bank) to Bettman Nut Enterprises, Inc.

2. Bettman Nuts, Inc. (sic) defaulted in the payment of its debt to Norstar Bank

and Norstar Bank availed itself of the plaintiff's full deposit in the sum of $40,-122.71 as security for that debt on or about January 17, 1987.

3. The pledge was made for no consideration.

Three witnesses testified. The plaintiff, William Perrine, the defendant, Martin Bettman, and a Norstar Bank official, Bernhardt Berg.

### THE FACTS

Sometime after the plaintiff, William Perrine, reached the age of 68 and retired, a friend suggested that he assist Martin Bettman who at that time was in the soft drink business, but shortly thereafter, began the manufacture of candy. He carried on these businesses through a corporation, Bettman Nut.

From 1972 until 1983 Perrine worked at the premises of Bettman Nut every day running errands, canning, making candy and doing whatever else was necessary. He worked without any compensation other than that the insurance on his car was paid for by the company.

Perrine's relationship with Bettman was not that of a social friend; the only occasions on which he visited Bettman's home was to run an errand or to use the premises for the manufacture of candy.

Sometime prior to February 1983 Bettman approached the Hempstead Bank about a loan and was advised that the Bank would require collateral. Bettman told Perrine, to whom he spoke almost daily, that he was in financial difficulty: "That we're tight and I've got to decide what I can afford to buy and which I can't, as far as ingredients were concerned and I wish I could put my hands on some additional money." (Tr., p. 5)

According to Perrine, Bettman asked for $25,000. Bettman assured him that the money would be repaid within three months as soon as his mother's will was settled, showing what he described as a copy of his mother's will. He told Perrine that she had left him a house and high-paying dividend stocks and various other

things. He insisted that he had to have money within two or three days or he would be in very big trouble. Perrine's recollection was that this conversation took place in June 1983.

Perrine's response was that he did not have $25,000 in cash but that he had a savings certificate. Bettman responded that the certificate could be used in lieu of cash.

Bettman then took Perrine to the Hempstead Bank where Bettman Nut maintained its account and introduced him to Mr. Berg, a bank official, saying, "Mr. Berg, Mr. Perrine has agreed to lend me $25,000 ... but Mr. Perrine doesn't have the cash he has a certificate and he claims he doesn't know too much about handling a certificate so would you help?" (Tr. p. 26)

Berg then gave Perrine various forms: a hypothecation agreement and an acknowledgment and assignment. These forms contained many blanks. He instructed Perrine to have his wife sign both documents, to bring the acknowledgment and assignment to the Heritage Federal Savings Bank which held the savings certificate and to arrange to have the Bank send the completed forms to the Hempstead Bank.

When the hypothecation agreement was given to William Perrine it was in blank. After he returned with it to the Hempstead Bank he signed it either once, or twice, in the presence of Mr. Berg who completed it. As completed it was dated February 8, 1983 and pledged the "Heritage Federal Savings & Loan Association Savings Certificate No. 6–710249" as collateral for a loan made "Bettman Nut Enterprises, Inc."

All the discussion at the Hempstead Bank was limited to the mechanics of the pledge, to how the documents should be signed and the arrangements made to transfer the savings certificate to the Hempstead Bank. All that Berg apparently told Perrine was that the forms would have to be filled in by him and his wife. When Berg was asked whether Bettman had indicated to Perrine for whom the loan was to be, he responded: "I cannot factually answer that, because I may have assumed, we both may have assumed what

the loan was for. I cannot say that was brought up." (Tr. p. 61).

On June 17, 1983, Perrine signed a second hypothecation agreement pledging a six-month money market certificate, No. 7022909, issued by the Hempstead Bank. It is this collateral which gave rise to the debt which the plaintiffs seek to have declared nondischargeable.

Before this new hypothecation agreement was signed, Berg met a second time with Perrine at which time he again gave him the hypothecation agreement in blank with instructions to have it completed by himself and his wife.

The second hypothecation agreement, like the first one, showed the collateral as pledged to secure the debt of Bettman Nut.

Perrine was asked whether at any time Berg or Bettman had indicated to him that the pledge he was making was for a debt for Bettman Nut and he responded, "Absolutely not."

## DISCUSSION

The meager record made by the plaintiffs in this proceeding is entirely inadequate to discharge the double burden they carry to prove fraud and nondischargeability. According to the pre-trial statement it was plaintiffs' position that he was fraudulently induced into pledging a certificate of deposit with the Norstar Bank "Based upon affirmative representations that the debt to be secured was for personal, as opposed to corporate, obligations and as to defendant's personal assets and personal solvency."

Plaintiffs' theory apparently is that since he was induced to lend money to a corporation in the belief, induced by misrepresentation, that he was lending it to the individual that the individual is liable to him for the amount of the corporate debt, and that since the debt thus created is the product of fraud it is not dischargeable. Plaintiff also contends that the statements as to the debtor's personal assets, since they were made for the benefit of a corporate alter ego, likewise give rise to a debt predicated on fraud.

The governing principles are well settled. "Under New York Law, the essential elements of a fraud claim are '(1) representation of a material existing fact; (2) falsity of the statement; (3) scienter; (4) deception; and (5) injury.' *Songbird Jet Ltd. v. Amax, Inc.,* 581 F.Supp. 912, 925 (S.D.N.Y. 1984) (footnote omitted), *affirmed by order,* 779 F.2d 39 (2nd Cir.1985)." *Lehman v. Dow Jones & Co, Inc.,* 783 F.2d 285, 295 (2nd Cir.1986).

The Bankruptcy Code excepts from discharge any debt "for money, property, services or an extension, renewal or refinancing of credit to the extent obtained by—(A) false pretenses, a false representation or *actual fraud,* other than a statement respecting the debtor's or an insider's financial condition ..." 11 U.S.C. § 523(a)(2)(A). (Emphasis added).

As Judge Platt noted in *In re Tesmetges,* 86 B.R. 21, 24 (E.D.N.Y.1988), *affirming* 74 B.R. 911 (Bankr.E.D.N.Y.1987):

> In order to make out a claim for nondischargeability of a debt under 11 U.S.C. section 523(a)(2)(A), a creditor must prove that: "the debtor made a false representation with the purpose and intention of deceiving the creditor; the creditor relied on such representation; his reliance was reasonably founded; and the creditor sustained a loss as a result of the representation." *In re Hunter,* 780 F.2d 1577, 1579 (11th Cir.1986). Proof of implied fraud is not enough. *In re Bombard,* 59 B.R. 952, 954 (Bankr.D. Mass.1986). Furthermore, the law is clear that the burden of proof is on the creditor to produce clear and convincing evidence substantiating each element of the claim. *In re Bombard,* 59 B.R. at 954; *In re Salett,* 53 B.R. 925, 928 (Bankr.D.Mass.1985). Regardless of whether *some* evidence is presented to prove fraud on the part of the debtor, if the creditor's burden of proof is not met, the debt may be declared dischargeable. *In re Kistler,* 46 B.R. 739, 740 (S.D.Iowa 1985).

■ Furthermore, fraud cannot be based on a false statement respecting the finances of either the debtor or an insider,

unless the statement is in writing. An insider is defined by 11 U.S.C. § 101(30). If the debtor is an individual, an insider includes a corporation in which the debtor is a director, or officer, or person in control. In parallel fashion, if the debtor is a corporation, an insider includes a director, officer or person in control of the debtor.

The plaintiffs in their post-trial brief argue that the debtor is an insider. Plaintiffs argue that "Congress intended that a creditor possess an action for false statements made for the benefit of a corporate alter ego." It would seem to be equally true that false statements made for the benefit of a corporate alter ego, if they relate to the financial condition of either the debtor, or the corporation, will lie within the exception from the non-dischargeability of debts arising from fraud made for oral statements respecting financial condition.

But no elaborate discussion of the law is necessary since the evidence fails to establish that Bettman made any false statement respecting the financial condition of either himself or Bettman Nut.

The only statements that Bettman is alleged to have made was that his mother had left him a house and some high-paying dividend stock and several other assets; that he was in trouble and he had to have money within two or three days and that the money would be repaid in three months. There is no proof that these statements were false. There is no evidence that Bettman's mother had not left him the assets which he described to Perrine. As to the promise to repay the money there is no evidence that Bettman did not intend to repay the money at the time he made the promise. Furthermore the promise necessarily has to relate to the original pledge which was made in February 1983 whereas the pledge on which suit was brought was entered into in June 1983 at which time it was obvious that promised repayment within three months had not taken place. There is no evidence that the promise to repay in three months was renewed in June 1983.

As to the claim that Perrine was led to believe that he was lending money to Bettman individually rather than to the corporation, the conversations to which Perrine testified are just as consistent with Bettman asking for money for his corporation as for himself personally since it is not unusual for the owner of a one man corporation to refer to the corporation and himself interchangeably when discussing financial problems. In any event, there is totally lacking here any evidence of scienter, that is that Bettman knew that Perrine believed himself to be lending money to him personally rather than to the corporation and that he intended to induce such error. The burden of proof was on Perrine to come forward with clear and convincing evidence of scienter, that Bettman knew that Perrine believed the loan to be personal and that he, Bettman, intended such deception. Perrine failed to do so.

What little evidence there is in this meager record is not helpful to the plaintiffs. In 1983 Perrine twice signed hypothecation agreements pledging collateral to Bettman Nut not Bettman. Although the first agreement was originally given him in blank, it was completed when he brought it into Hempstead Bank and his signature appears immediately below the language added at the Bank identifying the security as given for a loan to Bettman Nut Enterprises, Inc. The explanation for the signature that it was inserted in the wrong place by error is not persuasive.

The evidence is inadequate for other reasons. The only evidence given by Perrine as to conversations relating to the loan were claimed to have taken place in June 1983, but that was the time the pledge was renewed not when it was originally made. Furthermore, the Bank did not foreclose on the collateral until 1987, four years after Perrine claims to have been misled. What happened in the meantime, how is it that Perrine never inquired as to what had happened to his money?

It may very well be that Bettman took advantage of a rather trusting, elderly man but each of the various elements necessary to establish an exemption to a bankruptcy

discharge were not established here. The plaintiffs did not satisfy their burden of proof.

### Conclusions of Law

Any debt owed Perrine by Bettman in consequence of the pledge of collateral given the Hempstead Bank (now the Norstar Bank) to secure the debts of Bettman Nut Enterprises, Inc. is dischargeable in bankruptcy.

The Complaint is dismissed, without costs to either side. The Court is not awarding costs and attorney's fees to Bettman because in the special circumstances of this case the Court finds that to do so would be unjust.

Settle Judgment.